## WOODBURY v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. May 3, 1909.)

No. 2,798.

INDIANS (§ 18*) — LANDS — DEATH BEFORE TIME FOR ALLOTMENTS—PREMATURE APPLICATION AND SELECTION.

An Indian entitled to an allotment of land on the White Earth reservation in Minnesota under the Steenerson act (Act April 28, 1904, c. 1785, 33 Stat. 539 [U. S. Comp. St. Supp. 1907, p. 579]), providing for allotments to all Chippewa Indians residing on the reservation, who left with the agent his selection and application for an allotment before the preliminary work necessary to determine the size of the allotments was completed and notice given that applications might be filed in accordance with the instructions and practice of the department, but who died before such notice was given, acquired no vested right in the land selected which could pass to his heirs or legal representatives, his right being in the nature of a float which was terminated by his death before the time when in the orderly administration of the act he could lawfully make his application and selection.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 18.*]

Appeal from the Circuit Court of the United States for the District of Minnesota.

Harvey S. Clapp (C. B. Miller, on the brief), for appellant.
Charles C. Houpt, for the United States.

Before SANBORN and VAN DEVANTER, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. The complainant here and below claims that she has been unlawfully denied an allotment of land on the White Earth Indian reservation, and brings this suit under the act of February 6, 1901, c. 217, 31 Stat. 760, to have her right established and enforced. The facts out of which the controversy arises are as follows:

By treaty with the Chippewa Indians, bearing date March 19, 1867 (16 Stat. 719), the White Earth Indian reservation was set apart for their exclusive occupancy, and provision was also made that, whenever any member of the tribe should have 10 acres of land under cultivation, he should be entitled to a certificate granting to him the 40 acres of which the tract under cultivation was a part; and that, for each additional 10 acres so cultivated, an additional tract of 40 acres should be granted until he should have received in all 160 acres. January 14, 1889, a statute was passed commonly known as the "Nelson Act" (25 Stat. 642, c. 24), providing for the allotment of lands of the White Earth reservation to the Chippewa Indians in severalty. Every head of a family was to receive 160 acres. Others were to receive various quantities, either 40 or 80 acres. Under the treaty and this statute, title to numerous tracts was acquired. April 28, 1904, an act was passed commonly known as the "Steenerson Act" (33 Stat. 539, c. 1785 [U. S. Comp. St. Supp. 1907, p. 579]), which authorized the President to allot 160 acres of land to each Chippewa Indian residing on the White Earth reservation. It directed that, where any allot-

ment of less than 160 acres had theretofore been made, the allottee should be allowed to take an additional allotment, which, together with the land already allotted, should not exceed 160 acres. It was further provided "that if there is not sufficient land in said White Earth diminished reservation subject to allotment, each Indian entitled to allotment under the provisions of this act, shall receive a pro rata allotment." The President was authorized to make needful rules and regulations for the just execution of the act.

It is manifest that, for the making of allotments under the Steenerson act, considerable preliminary work was required. It was necessary for the agent first to ascertain the number of Indians entitled to its benefits, and then to compute the amount of unappropriated lands remaining on the reservation, and learn whether there was sufficient to make full allotments, or whether the land would need to be divided pro rata. Under date of June 7, 1904, the Secretary of the Interior gave direction to the Indian agent in charge of the White Earth reservation to proceed with the work of making allotments under the statute. In his letter of instructions he specified several bands of Indians residing, some of them on the reservation, and some of them in other parts of the state, who would be entitled to allotments, and directed that no member should receive an allotment unless he removed to, and took up his actual residence upon, the reservation. Under the previous statutes, rolls of the members of the tribe had already been made, and it was supposed that from these rolls it would be possible, in the main, for the agent to ascertain the Indians who were entitled to share in the benefits of the act. The direction contained also the following specific rule for the guidance of the agent:

"But in making these additional allotments, the usual rule and practice of this office must be observed, namely, the Indian must be in being at the time the allotment is made or assigned to him; in other words, no allotment can be made to a dead Indian."

The instructions further stated:

"It will be necessary for you to first determine so far as you can, by computation, whether there will be land enough on the diminished reservation to give each Indian entitled thereto an allotment of 160 acres."

Directions were then given for the making up of separate rolls for the additional allotments, and the letter closed with the following language:

"Should you need additional instructions upon any feature of the work, you should make request for the same."

The agent promptly entered upon the preliminary work necessary for carrying out the instructions. Within a few days, however, June 27, 1904, he received a letter from the Indian Department stating that the Otter Tail band of the Chippewa Indians had made a claim of right to allotments under the Steenerson act, and the agent was directed to submit the question of their right to a council of the Chippewa Indians. This he did, and reported the result, when the whole subject was referred to the Attorney General for his advice. In November or December following, this matter was settled by the department, and the agent then renewed the work of preparing the rolls and computing

the lands for the execution of the act. During all this time it is manifest that no application could be entertained from any member of the tribe for his selection of any specific tract, for two reasons: (1) Such a practice would have given the applicant an unjust advantage over the other members of the tribe, and would have been contrary to the established custom of the department in such cases. (2) Until the rights of the Otter Tail Band were determined, neither the number of Indians who were entitled to participate in the allotment, nor the amount of the individual allotments, could be known.

Turning now to the facts upon which the complainant bases her right, Joseph Woodbury, her husband, was a Chippewa Indian, and, while living, possessed the qualifications of an allottee on the White Earth reservation. On August 20, 1904, he presented to the agent in charge of the reservation, in writing, a selection of a specific tract for an additional allotment of about 80 acres. He was informed by the agent that the application could not be received, as the preliminary work necessary for making the allotments had not been completed. He was permitted, however, to leave the paper on file in the office. On September 2, 1904, Woodbury died. The preliminary work for making the allotments was completed in the month of April, 1905, and public notice was then given that applications would be received on and after April 24th of that year. So far as the record shows, no application was made on behalf of Woodbury at this time. Under date of November 8, 1905, a letter was written to the agent by the Commissioner of Indian Affairs, stating that complaint had been made to him by an attorney, purporting to act on behalf of Woodbury, that the allotment had not been made pursuant to Woodbury's application on August 20, 1904, and the commissioner directed that an allotment be made upon this application, notwithstanding Woodbury's death. When the agent came to comply with this direction, he discovered that the land selected by Woodbury had already been allotted to another Indian. The attorney purporting to act for Woodbury thereupon selected the tract of land here in controversy, and asked that it be allotted in lieu of the first tract selected. Such an allotment was thereupon made. Under the statute, allotments did not take effect until they were approved by the Secretary of the Interior. Under date of August 1, 1906, the Secretary of the Interior, acting upon advice from the Attorney General, decided that the allotment to Woodbury was invalid upon two grounds: (1) That at the time it was made, Woodbury was dead. (2) That, at the time the original application was filed, the work of allotment had not commenced, and the application was therefore premature and insufficient to initiate any right in the land. Under date of September 5, 1906, the Commissioner of Indian Affairs reported this decision to the agent, and directed him to cancel the allotment, which he promptly did. Thereafter the complainant, Edith Woodbury, acting both as widow of Woodbury, and administratrix of his estate, made a further application for the allotment of the land to her for her own use and the use of the heirs of the deceased. This application was denied, and the present suit was then brought.

The trial court dismissed the bill. We think its action was clearly

right. The argument of counsel for appellant proceeds upon the theory that as soon as the agent received the letter of instructions bearing date June 7, 1904, directing him to proceed with the work of allotment, the several members of the tribe were immediately entitled to present their selections for lands in severalty. The foregoing statement of facts and the instructions themselves show this contention to be unsound. The allotting of lands to the members of this tribe had been in progress, when the Steenerson act was passed, for nearly 40 years. The situation which had arisen was a complicated one. It was uncertain whether the reservation contained sufficient unappropriated lands to make the full allotments for which it provided. It was likewise true that the Indians who were to share in its benefits were not ascertained, and were scattered upon various reservations in the state of Minnesota; and, before the allotment could begin, they must be individually identified and brought to take up their residence on the reservation. The general practice of the Indian Department, as well as the letter of instructions in this case, required that all this preliminary work should be done in advance, and that public notice should then be given of a time at which the Indians would be entitled to present their applications. Any other procedure would have led to confusion, and would have been clearly unjust. While this work was in progress, no application could properly be received. It results that Woodbury's original application was made at a time when he had no right to make it, and was ineffectual to create any interest in the land selected, or any right thereto. This being the case, no right or interest in the land passed to his heirs or legal representatives upon his death by reason of the selection.

Counsel for complainant further contends that as Woodbury at the time of his death was a member of the tribe, and possessed of all the qualifications entitling him to an additional allotment, and as the only reason why his right had not ripened into an actual allotment was the preliminary administrative work necessary to carry out the project, this, being no fault of his, ought not to impair his right. The difficulty with this argument is that the delay was nobody's fault. It must have been contemplated by Congress. Until the allotment was made, Woodbury's right was personal—a mere float —giving him no right to any specific property. This right, from its nature, would not descend to his heirs. They, as members of the tribe, were severally entitled to their allotments in their own right. To grant them the right of their ancestor, in addition to their personal right, would give them an unfair share of the tribal lands. The motive underlying such statutes forbids such a construction. As the learned United States attorney says, in his able brief:

"It is well to remember that these Indian laws were not enacted merely to create property rights for the enrichment of Indian families. They were designed to operate on the individual Indian in his lifetime, to the end that they might mold and shape his life and habits somewhat after the manner and ways of civilization."

The instructions for making the allotments approved by the President required that "the Indian must be in being at the time the allotment is made or assigned to him; in other words, no allotment can

be made to a dead Indian." Woodbury's failure to secure his allotment in his lifetime was not the fault of anybody. If the preliminary work had been completed, and the allotting of lands actually commenced, and Woodbury's selection had then been refused or postponed by the administrative officers in charge of the work, his failure to receive his allotment would have been attributable to them, and the law would have given him every right which he would have obtained if they had performed their duty. That is the principle underlying the case of Smith v. Bonifer (C. C.) 132 Fed. 889. This appears clearly from the quotation made by the court from Lytle v. State of Arkansas, 9 How. 333, 13 L. Ed. 153, as follows:

"It is a well-established principle that when an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him."

That principle, however, cannot be applied to the present case, because here there was no "misconduct or neglect of a public officer" which defeated Woodbury's right. Hy-yu-tsi-mil-kin v. Smith, 194 U. S. 401, 24 Sup. Ct. 676, 48 L. Ed. 1039, presents another branch of the same controversy. From the opinion of the Supreme Court it appears clearly that the complainant's right was there defeated by the wrongful act of the commissioners charged with the duty of making the allotments, and their misconduct is the very ground of granting relief to the complainant.

The decree of the trial court was clearly right, and it should be affirmed.