BRANN v. BELL et al.

BELL et al. v. BRANN

(Circuit Court, E. D. Oklahoma. February 20, 1911.)

No. 869.

1. INDIANS (§ 18*)—LANDS—ALLOTMENT TO DECEASED MEMBERS OF CREEK TRIBE—CONSTRUCTION OF TREATY—"DESCEND."

In the original Creek Agreement, ratified by Act March 1, 1901, c. 676, § 28, 31 Stat. 869, which provided that, in case of the death of a person entitled to enrollment as a member of the tribe, his distributive share of its lands and money, to which he would have been entitled if living, should descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly, the word "descend" is not used in its strict legal sense, but as meaning that the lands and property of the deceased member shall be allotted to the same persons who would have inherited if such member had survived to receive the allotment, and such persons took no vested interest before allotment. Hence, where such deceased member had not been enrolled and no allotment had been made at the time of taking effect of the Supplemental Agreement, ratified by Act June 30, 1902, c. 1323, 32 Stat. 500, which by section 6 repeals such provisions "in so far as they provide for descent and distribution according to the laws of the Creek Nation," and provides that such descent and distribution shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas, the later provision governs, and title to the allotment, when made, passes to those who would inherit under the Arkansas statute.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*

For other definitions, see Words and Phrases, vol. 3, pp. 2012–2014.]

2. INDIANS (§ 18*)—LANDS—DESCENT—ILLEGITIMACY.

Under Mansfield's Dig. § 2524 (Ind. T. Ann. St. 1899, § 1822), providing that "illegitimate children shall be capable of inheriting and transmitting the inheritance on the part of their mother in like manner as if they had been legitimate of their mother," and which by the Supplemental Creek Agreement, ratified by Act June 30, 1902, c. 1323, 32 Stat. 500, is made to govern the descent of lands of members of the tribe who died before an allotment was made, the illegitimate half-sister of such a deceased member, having the same mother, may inherit from him, regardless of her illegitimacy.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by James Brann against L. A. Bell and others to remove cloud from title, and cross-bill by defendants to recover the land in question. On preliminary hearing to settle law of descent applicable.

A. A. Davidson, Butte, Boone & Johnson, and Veasey & Rowland, for plaintiff.

Geo. S. Ramsey, C. L. Thomas, and Robert F. Blair, for defendants.

CAMPBELL, District Judge. At the hearing of this case, certain questions of law arose which it appeared to the court should be determined before taking up the questions of fact involved, for the reason that it appeared that the ultimate facts necessary to be determined would depend somewhat upon whether the court should find the law as contended for by the plaintiffs or the defendants. The court, having heard the argument of counsel, and having considered the briefs filed upon both sides, has reached certain conclusions as to the law of the case, which will be briefly stated in this memorandum, not filed as a formal opinion in the case, but merely a memorandum so that in the future progress of the case counsel may understand the court's conclusions as to the law involved.

[1] Garfield Colbert was a Creek freedman, entitled to enrollment on the Creek freedman roll under the provisions of both the Original and Supplemental Agreements. He was living on April 1, 1899, and died subsequently, in either the same or the following year. At the time of his death he was a minor, unmarried, and intestate, not having been enrolled on the final roll, nor having selected his allotment. Under the provisions of section 28 of the original Creek Agreement (Act Cong. March 1, 1901; 31 Stat. 869), his name was entitled to be placed upon the freedman roll of the Creek Nation, and his distributive share of the lands and money of the tribe, to which he would have been entitled if living, it was provided, should "descend" to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly. Application for his enrollment was made in 1906, and he was accordingly enrolled as a freedman citizen of the Creek Nation, and his enrollment was approved by the Secretary of the Interior in June, 1906. On July 9, 1906, the land in controversy, together with other land, was set apart by the Commission to the Five Civilized Tribes in the name of Garfield Colbert, deceased, as the allotment to which he would be entitled if living, and certificate of allotment was issued by the commission on that date. On May 24, 1907, patent was executed to said land, Garfield Colbert being the grantee named therein. In the meantime, and prior to the selection of the allotment, the Supplemental Creek Agreement (Act June 30, 1902, c. 1323, 32 Stat. 500) had been entered into between the United States and the Creek Nation, and had become effective. By section 6 of that agreement it was provided:

"The provisions of the act of Congress approved March 1, 1901, * * * in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed, and the descent and distribution

of land and money provided for by said act, shall be in accordance with Chapter 49 of Mansfield's Digest of the Statutes of Arkansas, now in force in the Indian Territory."

While the land in this case cannot be said to "descend" from Garfield Colbert to his heirs because the title never vested in him, still it was no doubt used advisedly by Congress and the Creek Nation, with intent that the title should pass as if the deceased member of the tribe had survived to receive his allotment. As said by Judge Amidon in Shulthis v. McDougal, 170 Fed. 529, 95 C. C. A. 615:

"The word 'descend' is, of course, inapplicable to the actual contingency provided for by the statute, because that contingency contemplates the death of the child before he had actually become seised of any interest in the land. The word 'descend' is a word of art, and indicates the transference of property by inheritance. If any significance is to be given to it, as used in this section, it must be held that the intent of the parties to the agreement was that the land should pass to the same persons and in the same proportions as it would have passed if the child had died seised of it. Any other construction simply obliterates this word, and makes the land pass to the parties who are heirs directly by allotment from the tribe. The statute itself not only declares that it shall 'descend,' but also declares that it shall be 'allotted and distributed' to the heirs. It is manifest, therefore, that both ideas were in the minds of the parties to the agreement. This construction receives further support by the general scheme which the federal government and the Creek Nation formed for the disposition of the tribal property. The first requisite for the partition of the tribal estate in severalty among its members was to ascertain and legally establish who were members of the tribe. By reason of the many intermarriages between members of the tribe and members of the white and negro races, and by reason of the fraudulent claims to membership, the ascertainment of the particular persons who were in fact entitled to such membership proved a much more difficult task than was at first anticipated. The commission was empowered and directed to prepare such a roll. This work not only required much investigation on its part, but resulted in voluminous litigation. Instead of being the work of months, it proved to be the work of years. In the meantime, however, the membership of the tribe was constantly undergoing change by birth and death. In order to provide for all members of the tribe who were born subsequent to the beginning of the enrollment, the date of right to enrollment was twice set forward, the statute last quoted fixing the latest date. By reason of these facts, when the roll was completed, it contained more names than there were members in being. The roll, however, furnished the basis for the division of the tribal estate. Every person whose name was entered on the roll was entitled to an equal proportion of the tribal lands and funds; but by reason of the fact that before actual distribution could be made, and even while the enrollment was in progress, some persons whose names were on the roll would die, the statute made provision for the disposition of the share of tribal property which would go to them if living. Such a provision was necessary. Otherwise, there would have been a portion of the tribal property undistributed. It was never the intent, however, either of the tribe or the federal government to grant to parties having a kinsman who had died before the actual making of the allotment additional lands as a bounty. These kinsmen got all their right to additional lands under and through the enrolled member who had died. Whether the ancestor was actually seised of the property or not in his lifetime was immaterial. It was the intent of the statute that the property should pass by the same right and in the same manner as it would have passed if the person enrolled had survived to receive his allotment. The tribe was not bestowing such land as a bounty, but was simply providing for the right of inheritance."

It is contended by counsel for plaintiffs that the Original Creek Agreement, wherein it provided for enrollment and the allotment of

an equal portion in value of the land of the tribe to each enrolled member, amounted to a grant in præsenti to the living members of the tribe entitled to enrollment and to the heirs of such members as were living on April 1, 1899, and had since died, and that in cases such as this, where the member entitled to enrollment was dead, at the time of the adoption of the original Creek Agreement, an interest in the land vested at once by operation of the agreement in his heirs, according to the Creek law, of which neither Congress nor the tribe could divest them by subsequent legislation. I cannot agree with this contention. It was an agreement between Congress and the tribe, first, as to who should be enrolled and what should constitute the final roll which, as Judge Amidon says in Shulthis v. McDougal, supra, was to be the basis for the division of the land; and, second, the share which each member so enrolled or his heirs, in case of his death, should receive of the tribal lands and funds, when the allotment and division of the same should thereafter be made, according to the plan outlined in the agreement. In Hayes v. Barringer, 168 Fed. 221, 93 C. C. A. 507, the Circuit Court of Appeals, speaking through Judge Sanborn, regarding the rights of enrolled members of the Choctaw and Chickasaw Nations before actual allotment of the lands, say:

"But these were public lands, and, while the enrolled members of these tribes undoubtedly had a vested equitable right to their just shares of them against strangers and fellow members of the tribe, they had no separate or individual right to or equity in any of these lands which they could maintain against the legislation of the United States or of the Indian Nation."

The same court, in Wallace v. Adams, 143 Fed. 716, 74 C. C. A. 540, speaking of the act creating a citizenship court, say:

"When it was passed, the Dawes Commission, to whom Congress had delegated the power to distribute the lands of the tribe, had not allotted the land in dispute to the defendant. He had, therefore, acquired no vested right in it as against subsequent legislation of the United States. because, until such an allotment was made, all the proceedings determinative of citizenship and of distribution which derived their force and effect from the legislative power of the United States alone were necessarily subject to the further exercise of that authority."

See, also, Woodbury v. United States, 170 Fed. 302, 95 C. C. A. 498; Muskrat v. United States, 44 Ct. Cl. 137.

It follows that in this case, where the deceased member was not enrolled, and the actual enrollment did not take place until after the supplemental Creek Agreement became effective, no rights had become vested in any individuals as the heirs of Garfield Colbert at the time of the adoption of the supplemental agreement, so as to preclude Congress from changing the test of heirship from that outlined in the Creek law, to that outlined in the Arkansas law. The title therefore passed by the allotment and patenting of the land, to the heirs of Garfield Colbert, as determined by the Arkansas law. It is as if the original agreement had provided that the land should descend and be allotted to the heirs of Garfield Colbert as provided by the Arkansas law, for, before the allotment and distribution of the land,

section 6 of the Supplemental Agreement had so amended the original agreement.

I have not overlooked the case of Irving v. Diamond, 23 Okl. 325, 100 Pac. 557. It is urged that this case announces a doctrine contrary to the foregoing conclusions. I do not find that it clearly appears from the opinion whether or not the allotment was selected and set apart to the heirs of the deceased member of the tribe before August 8, 1902, the date of the taking effect of the supplemental agreement. It does state that he was duly enrolled upon the freedman roll of the Creek Nation, and died intestate on August 16, 1900, and that after his death, and on October 6, 1902, there was allotted in his name and a deed or patent executed to the tract of land involved. In view of the uniform practice of the commission in issuing the allotment certificate a number of months at least in advance of the patent, it may fairly be assumed that such was the case here, and that the allotment was in fact selected and set apart prior to August 8, 1902, in which event the heirs according to the Creek law would have acquired a vested interest in the land prior to the supplemental agreement. I am informed through brief of counsel for defendants in the case at bar that the records of the commission in fact show that the land involved in the case of Irving v. Diamond, supra, was selected and set apart as the allotment of Edward Irving on October 20, 1899, and prior to his death, so that it is not clear that on the facts involved the holding in that case is at variance with the conclusions I have reached.

[2] In one of the briefs it is suggested that it may be contended that Gertrude Grayson, through whom the defendants claim, is a bastard, the illegitimate child of the mother of Garfield Colbert, and his half-sister. By section 2524 of Mansfield's Digest, a part of chapter 49 (Ind. T. St. 1899, c. 21, § 1822), it is provided that:

"Illegitimate children shall be capable of inheriting and transmitting the inheritance, on the part of their mother, in like manner as if they had been legitimate of their mother."

This provision of the Arkansas law had been construed by the Supreme Court of that state in the case of Gregley v. Jackson, 38 Ark. 487, prior to the time the law was adopted by the supplemental agreement, and in that case it was held that children of the same mother, whether legitimate or illegitimate, may transmit an inheritance to any and all collateral relations on the mother's side, who are of her blood.

It therefore follows that, Gertrude Grayson and Garfield Colbert having a common mother, the former could inherit from the latter, regardless of her illegitimacy.