McKEE v. HENRY.

(Circuit Court of Appeals, Eighth Circuit. November 11, 1912.)

No. 3,718.

INDIANS (§ 13*)—LANDS—DESCENT—STATUTORY PROVISIONS.

Under an allotment in November, 1902, to a Creek Indian, who died in November, 1899, and was duly enrolled, a deed to his heirs passes title, under Act Cong. June 30, 1902, c. 1323, § 6, 32 Stat. 501, providing for the descent and distribution of the property of Creek Indians according to Mansf. Dig. Ark. §§ 2522-2545, to the allottee's brother, and not, under Act March 1, 1901, c. 676, § 28, 31 Stat. 869, providing for descent and distribution according to the laws of the Creek Nation, to his father; no title having vested in severalty till the allotment was made, after the passage of the act of 1902.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 30; Dec. Dig. § 13.*]

Appeal from the Circuit Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Bill in equity by Hugh Henry, guardian of Coy Warden, against W. L. McKee. From a decree for complainant, defendant appeals. Affirmed.

Preston C. West, of Muskogee, Okl. (Lex V. Deckard, of Okmulgee, Okl., on the brief), for appellant.

George S. Ramsey, of Muskogee, Okl. (William M. Matthews and C. L. Thomas, both of Muskogee, Okl., on the brief), for appellee.

Before SANBORN, HOOK, and SMITH, Circuit Judges.

SMITH, Circuit Judge. Clarence N. Warden was not a member of the Creek or Muskogee tribe of Indians, and has never been received or enrolled as such, but he lawfully married a woman of part Creek Indian blood. She was recognized as a member of the Creek tribe, and bore to Warden two sons, Coy Warden and Hugh Warden, and then died leaving as her sole issue said sons. Hugh Warden was born in January, 1899, and died November 28, 1899.

Under the fourteenth article of the treaty of March 24, 1832 (7 Stat. 366), the third article of the treaty of February 14, 1833 (7 Stat. 417), by the letters patent issued to the Creek Nation of the 11th day of August, 1852, and the third article of the treaty of August 7, 1856 (11 Stat. 699), the lands of the Creek Nation situated in Indian Territory were held by them as a tribe in fee simple so long as they should exist as a nation and continue to occupy the lands. By Act March 1, 1901, c. 676, 31 Stat. 861, confirming the agreement between the Dawes

Commission, on behalf of the United States, and the Creek tribe of Indians, as by said act amended, provision was made for the allotment of said lands in severalty. By section 28 of said act it was provided:

"All citizens who were living on the first day of April, eighteen hundred and ninety-nine, entitled to be enrolled under section twenty-one of the act of Congress approved June twenty-eighth, eighteen hundred and ninety-eight, entitled 'An act for the protection of the people of the Indian Territory, and for other purposes,' shall be placed upon the rolls to be made by said Commission under said act of Congress, and if any such citizen has died since that time, or may hereafter die, before receiving his allotment of lands and distributive share of all the funds of the tribe, the lands and money to which he would be entitled, if living, shall descend to his heirs according to the laws of descent and distribution of the Creek Nation, and be allotted and distributed to them accordingly."

Hugh Warden having lived from January, 1899, to November, 1899, his name was properly put upon the rolls. On June 30, 1902 (32 Stat. 500, c. 1323), Congress with certain modifications confirmed a supplemental agreement on the same subject with the Creek Indians which contained the following:

"6. The provisions of the act of Congress approved March 1, 1901 ([Act March 1, 1901, c. 676] 31 Stat. L. 861), in so far as they provide for descent and distribution according to the laws of the Creek Nation, are hereby repealed and the descent and distribution of land and money provided for by said act shall be in accordance with chapter 49 of Mansfield's Digest of the Statutes of Arkansas now in force in Indian Territory: Provided, that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation: And provided further, that if there be no person of Creek citizenship to take the descent and distribution of said estate, then the inheritance shall go to noncitizen heirs in the order named in said chapter 49."

Subsequently and on November 12, 1902, there was allotted to said Hugh Warden the 160 acres of land here in controversy. July 1, 1904, the Principal Chief of the Creeks executed a deed of this land, which was approved by the Secretary of the Interior, to the heirs of Hugh Warden. June 3, 1908, Clarence N. Warden conveyed the land to W. L. McKee, and this deed was recorded. Hugh Henry is the guardian of Coy Warden, and brought this suit, alleging he was in possession of the premises in question, and asking a decree canceling the deed from Clarence N. Warden to W. L. McKee and quieting his title. The case was submitted upon an agreed statement of facts, a decree was entered as prayed, and Mr. McKee appeals.

The sole question in this case is as to who took the title to the lands under the conveyance to the heirs of Hugh Warden—his father, Clarence N. Warden, or his brother, Coy Warden. There is little or no dispute that under the laws of descent and distribution of the Creek Nation the father of Hugh Warden was his heir, and, on the other hand, under chapter 49 of Mansfield's Digest of the Statutes of Arkansas and the provision "that only citizens of the Creek Nation, male and female, and their Creek descendants shall inherit lands of the Creek Nation," Coy Warden was the sole of Hugh Warden, and the question is: Was the act of June 30, 1902, made after the enrollment, but before any allotment had been made to Hugh Warden, applicable to this tract; and, if so, was it valid?

This case has been argued with great care; but, in the view taken of it, it will be only necessary to consider a small number of the points presented. It must be remembered that this land was in only partially organized territory of the United States at the time in question, and the Constitution provides:

"The Congress shall have power to * * * make all needful rules and regulations respecting the territory * * * belonging to the United States." Section 3, article 4, of United States Constitution.

That is to say, Congress had full power to make laws of descent in Indian Territory, independently of the Indians or other people residing there; but the Muskogee or Creek tribe of Indians were under the special guardianship of Congress, and it had plenary authority over them. Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299.

It is not meant that Congress could defeat the Indian title which was held under patent from the United States, much less that a title once allotted could be disturbed. Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941. But it had full and ample authority to fix the laws of descent, with or without the consent of the Indians, both under its guardianship of the Indians and their property, and under its power to make all needful rules and regulations respecting the territory belonging to the United States. It had this right to make laws by agreement with the Indians, but it beclouds the issue if it be assumed that such agreement was necessary when it was not. These lands belonged to the Indians as a tribe so long as the tribe existed and they occupied the land, with reversion to the United States; but no part of these lands belonged to any specific Indian. The Muskogee or Creek tribe was in the nature of a dependent nation; and as our national public buildings belong to the nation, the citizen, while he has an interest in them, has no share in the title to them, so these lands, so far as the Indian title was concerned, belonged to the tribe as a community, and no separate Indian had any title whatever, severally or as a tenant in common. No law or agreement to divide the lands in severalty had any effect to create such a title until the lands were actually allotted. All these laws contemplated that the tribe, through its members, would receive substantially the whole reservation in lands or money. If the right to lands was vested after enrollment and before allotment, then why was the interest of the Indians not actually vested in the remaining lands and money? Yet it was expressly held in Gritts v. Fisher, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928, that the interest in the remaining lands and money was not vested, and that new participants could be added by Congress.

The enrolling primarily established the right of citizenship, and only incidentally conferred the right to allotment, and until allotment was made no inheritable right vested in the individual Indian.

"The lands and moneys of these tribes are public lands and public moneys, and are not held in individual ownership, and the assertion by any particular applicant that his right therein is so vested as to preclude inquiry into his status involves a contradiction in terms." Stephens v. Cherokee Nation, 174 U. S. 445, 488, 19 Sup. Ct. 722, 738 (43 L. Ed. 1041).

The title, so far as here pertinent, of the Creeks, was identical with the title of the Cherokees to their lands, and in Cherokee Nation v. Hitchcock, 187 U. S. 294, 307, 23 Sup. Ct. 115, 120 (47 L. Ed. 183), it is said:

"Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members. The Cherokee Trust Funds, 117 U. S. 288, 308 [6 Sup. Ct. 718, 29 L. Ed. 880]. The manner in which this land is held is described in Cherokee Nation v. Journeycake, 155 U. S. 196, 207 [15 Sup. Ct. 55, 60 (39 L. Ed. 120]), where this court, referring to the treaties and the patent mentioned in the bill of complaint herein, said: 'Under these treaties, and in December, 1838, a patent was issued to the Cherokees for these lands. By that patent, whatever of title was conveyed was conveyed to the Cherokees as a nation, and no title was vested in severalty in the Cherokees, or any of them.'"

As already suggested, if enrollment conferred a vested interest in any lands, why did it not confer a vested interest in any money or other property belonging to the tribe? Yet it has been held that the power of Congress to admit new persons to the rolls, thereby depleting the amount which would go to those previously on the rolls, is political in its character, and not within the control of the courts. Muskrat v. United States, 219 U. S. 346, 31 Sup. Ct. 250, 55 L. Ed. 246.

In Woodbury v. United States, 170 Fed. 302, 95 C. C. A. 498, this court characterized the right of an Indian long after his enrollment, but before allotment, as "a mere float—giving him no right to any specific property."

When the allotment was made for the first time the rights of any individual vested, and the title became vested in the one at that time fixed by the law, and it makes no difference what previous laws may have provided.

In the conclusion we have reached we find that we are in harmony with the Supreme Court of Oklahoma. Brady v. Sizemore, 124 Pac. 615; Shellenbarger v. Fewel, 124 Pac. 617.

While our conclusion has been reached upon the authority of the Supreme Court of the United States, of this court, and what seems to us sound reason, it is gratifying to find that there is uniformity in the decisions of the state courts and this court.

At any time after enrollment, and before allotment, Congress could have repealed all legislation providing for allotment, and have restored the old system of tribal control; and, if this is true, manifestly no inheritable interest vested in any one until allotment.

The decree of the Circuit Court is affirmed.