## BLEDSOE v. WORTMAN *et al.*

No. 1944.   Opinion Filed January 7, 1913.

(129 Pac. 841.)

1. **INDIANS—Conveyance by Allottee—Validity—Selection of an Allotment.** F., an adult, not of Indian blood, but a member of the Cherokee Tribe of Indians, on January 27, 1905, but prior to the time of the selection of his allotment, conveyed a certain 40 acres of land, which was then a part of the public domain of the Cherokee Nation, but which was afterwards selected by him as a part of his surplus allotment. **Held,** that Act April 24, 1904, c. 1402, 33 St. at L. 204, removing "all restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians, who are not of Indian blood, except minors," except as to homesteads, had no application to him until after he had selected his allotment.

2. **SAME—Invalidity—Subsequent Title.** Section 642, c. 27, Mansf. Dig. of Ark. (1884), providing that: "If any person shall con-

Bledsoe v. Wortman et al.

vey any real estate by deed, purporting to convey the same in fee simple absolute, or any less estate, and shall not at the time of such conveyance have the legal estate in such lands, but shall afterward acquire the same, the legal or equitable estate afterward acquired shall immediately pass to the grantee, and such conveyance shall be as valid as if such legal or equitable estate had been in the grantor at the time of the conveyance'' —has no application to said conveyance, the same being at the time of said execution invalid.

(Syllabus by the Court.)

*Error from District Court, Mayes County;*
*T. L. Brown, Judge.*

Action by C. S. Wortman and R. W. Canfield against I. P. Bledsoe. Judgment for plaintiffs, and defendant brings error. Affirmed.

*J. H. Langley,* for plaintiff in error.

*C. S. Wortman* and *J. I. Howard,* for defendants in error.

WILLIAMS, J. On June 17, 1908, the defendants in error, hereinafter referred to as plaintiffs, commenced an ejectment action in the district court of Mayes county against plaintiff in error, hereinafter designated as defendant, for the possession of the N. E. ¼ of N. W. ¼ of section 26, township 20 N., range 18 E., situated in said county. After issue was framed, the cause was submitted to the court upon the following agreed statement of facts:

"It is agreed by and between the parties to the above-entitled cause, by their respective attorneys, that the defendant has a deed from Jess Fulsom to the lands in controversy, dated January 27, 1905, the lands being the N. E. ¼ of the N. W. ¼ of section 26, township 20, range 18, situated in Mayes county, state of Oklahoma, which said deed was filed for record in the office of the clerk of the United States Court for the Northern District of the Indian Territory, at Pryor Creek, on the 25th day of April, 1905, and duly recorded in Book C, at page 382, and which was the proper office for the recording of a deed upon said lands at the time said deed was executed, and at the time of its recording; said lands being situated in the Fifth recording district for the Indian Territory.

"It is further agreed: That the grantor, Jess Fulsom, at the time of the execution of said deed, was a Cherokee freedman,

and was entitled to an allotment of lands in the Cherokee Nation, and that the lands therein conveyed and in controversy in this case were his surplus lands, and that said deed was executed subsequent to the act of Congress removing the restrictions on the alienation of surplus land of Cherokee freedmen. At the time of said conveyance the said grantor, Jess Fulsom, had not selected the lands described in said deed, at the time of the execution thereof, as aforesaid, and did not select said lands as a portion of his allotment until the 6th day of March, 1905, and subsequent to the execution of said deed of conveyance to the defendant herein. That said deed, in addition to conveying the lands above described, also includes other lands not in controversy herein, to wit, the S. W. ¼ of the S. W. ¼ of the S. W. ¼ of section 32, township 20, range 20, in what is now Mayes county, Okla.

"It is further agreed that thereafter, to wit, on the 1st day of February, 1908, and subsequent to the date of the selection and allotment of the land therein conveyed, the said Jess Fulsom, by proper warranty deed, conveyed to the plaintiffs herein, C. S. Wortman, and R. W. Canfield, the land in controversy herein, to wit, the N. E. ¼ of the N. W. ¼ of section 26, township 20, range 18, and that said grantees now hold and claim title under said deed as aforesaid. It is further agreed that in case plaintiffs herein are entitled to a judgment for $50 as the reasonable value of the land in controversy for the year 1908 and up to this time," etc.

At the time the deed of January 27, 1905, was executed by said Fulsom to the defendant, he had not selected said lands as a part of his allotment.

The sole question for determination in this case, under the record, is whether said Fulsom could execute a valid conveyance to his surplus allotment prior to the time of his selection of the same. In *Goat et al. v. United States,* 224 U. S. 458, 32 Sup. Ct. 544, 56 L. Ed. 841, it is said:

"The inalienability of the allotted lands was not due to the quality of the interest of the allottee, but to the express restriction imposed. Their equitable interest was one which, in the absence of restriction, they could convey.   *   *   *"

In *Mullen et al. v. United States,* 224 U. S. 457, 32 Sup. Ct. 498, 56 L. Ed. 834, it is said:

"There being no restriction upon the right of alienation, the heirs in the cases involved in this appeal were entitled to make the conveyances. * * * "

Under the authority of said cases, after land has been allotted to members of the Five Civilized Tribes by the United States government, unless some restriction has been imposed against alienation, such land then becomes alienable. Act Cong. April 21, 1904, c. 1402, 33 St. at L. pp. 189, 204, entitled "An act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian Tribes for the fiscal year ending June thirtieth, nineteen hundred and five, and for other purposes," provides:

"And all restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed, and all restrictions upon the alienation of all other allottees of said tribes, except minors, and except as to homesteads, may, with the approval of the Secretary of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe."

The allotment having been selected, the fact that no patent had issued did not prevent the conveyance of the allottee's equitable estate therein. *Goat et al. v. United States, supra; Godfrey v. Iowa Land & Trust Co.*, 21 Okla. 293, 95 Pac. 792; *McWilliams Inv. Co. v. Livingston et al.*, 22 Okla. 884, 98 Pac. 914. But, when the first deed was executed by the said Fulsom, he was not an allottee, not having selected his allotment, and therefore had no equitable estate which he could then convey. *Goat et al. v. United States, supra; McKee v. Henry*, 201 Fed. 74. At that time such land was a part of the public domain of the Cherokee Nation, and he was not permitted to convey any part thereof. *Gritts v. Fisher*, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928; *Stephens v. Cherokee Nation*, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041. Section 11 of the Cherokee Agreement (Act of July 1, 1902, c. 1375, 32 St. at L. 717) provides that:

"There shall be allotted by the Commission to the Five Civilized Tribes, and to each citizen of the Cherokee Tribe, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value

to one hundred and ten acres of the average allottable lands of the Cherokee Nation, to conform as nearly as may be to the areas and boundaries established by the Government survey, which land may be selected by each allottee so as to include his improvements."

In *McLaughlin v. Ardmore Loan & Trust Co.*, 21 Okla. 173, 95 Pac. 779, section 2118 of the Revised Statutes of the United States, which is as follows, is applied:

"Every person who makes a settlement on any lands belonging, secured or granted by treaty with the United States to any Indian tribe, or surveys or attempts to survey such lands, or to designate any of the boundaries by marking trees, or otherwise, is liable to a penalty of one thousand dollars. The President may, moreover, take measures and employ such military force as (he) may judge necessary to remove any such person from the lands."

In that case the plaintiff in error, a member of the Choctaw Tribe of Indians, holding possession of lands in excess of that permitted by section 16, c. 1366, Act Cong. July 1, 1902, 32 St. at L. 643, sold such excessive holding to a person not a member of said tribe. In the opinion it is said that, as the contract of sale "had for its object the violation of law, it is illegal and cannot be enforced." The same holding was made in *Combs et al. v. Miller*, 24 Okla. 576, 103 Pac. 590. See, also, *Howard et al. v. Farrar*, 28 Okla. 490, 114 Pac. 695.

The Cherokee Agreement (Act Cong. July 1, 1902, 32 St. at L. 716, c. 1375) provides:

"Sec. 14. Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act. * * *

"Sec. 15. All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent. * * *

"Sec. 18. It shall be unlawful after ninety days after the ratification of this act by the Cherokees for any member of the Cherokee Tribe to inclose or hold possession of, in any manner, by himself or through another, directly or indirectly, more lands in value than that of one hundred and ten acres of average al-

lottable lands of the Cherokee Nation, either for himself or for his wife, or for each of his minor children, if members of said tribe; and any member of said tribe found in such possession of lands, or having the same in any manner inclosed, after the expiration of ninety days after the date of the ratification of this act shall be deemed guilty of a misdemeanor."

Said sections 14 and 15 were construed by this court in *Allen v. Oliver,* 31 Okla. 356, 121 Pac. 226, wherein it was held that:

"Under sections 14 and 15 of the Cherokee Agreement, approved July 1, 1902 (Act July 1, 1902, c. 1375, 32 St. at L. 717), all lands allotted to members of the said tribe, except homesteads, were alienable in five years after issuance of patent, and not prior thereto."

This holding by this court was approved by the Eighth Circuit Court of Appeals in *Trusket et al. v. Closser* (C. C. A.) 198 Fed. 835 Not only were noncitizens and corporations prohibited by said section 2118 of the Revised Statutes of the United States from making a settlement on any lands belonging to the Cherokee Tribe or from surveying or attempting to survey such lands or designating any of the boundaries by marking trees or otherwise, independent of the performance of official duties under direction of the United States government or tribal government, but also after the passage of act July 1, 1902, c. 1375, 32 St. at L. p. 716, and the expiration of 90 days from said date, it was not permissible for any member of the Cherokee Tribe to inclose or hold possession of, in any manner, by himself, or through another, directly or indirectly, more lands in value than that of 110 acres of average allottable lands of the Cherokee Nation, either for himself or his wife, or for each of his minor children, if members of said tribe; and any member of said tribe found in such possession of lands, or having the same in any manner inclosed, after the expiration of 90 days after the date of ratification of said act, was to be deemed guilty of a misdemeanor.

Obviously Jess Fulsom, a Cherokee freedman, to whom the land in controversy was allotted, had no authority to alienate said land, except by virtue of said act April 21, 1904, removing the restrictions upon the alienation of the lands of all allottees of either of the Five Civilized Tribes, who are not of Indian blood,

except minors and except as to homesteads. The limitation or prohibition under said section 14 is that lands allotted to citizens shall not be alienated by the allottee or his heirs, and under said section 15 the grant, which also operated as a limitation or restriction against alienation to such date, is that lands allotted to members of said tribe shall be alienable in five years after issuance of patent. The restriction removal provision of act April 21, 1904, c. 1402, 33 St. at L. 189, harmonizes with said sections 14 and 15, as restrictions upon the alienation of the lands of allottees of the Five Cilivized Tribes, who are not of Indian blood, except minors and as to homesteads, are removed. Prior to April 21, 1904, the lands of the Cherokee Nation were absolutely inalienable until allotted to members of said tribe. Said act of April 21, 1904, sought to take off this restriction as to certain lands of *allottees,* not to remove restrictions upon the distributive share of any members of the tribe prior to allotment. The restriction which had been imposed upon the allottees by said sections 14 and 15 was only in part removed. Such parties became allottees only after the land had been allotted to them.

In *MeKee v. Henry,* 201 Fed. 74, decided by the United States Circuit Court of Appeals, Eighth Circuit, at its September, 1912, term, that court said:

"The Muskogee or Creek Tribe was in the nature of a dependent nation, and, as our national public buildings belong to the nation, the citizen, while he has an interest in them has no share in the title to them, so these lands, so far as the Indian title was concerned, belonged to the tribe as a community, and no separate Indian had any title whatever severally or as a tenant in common. No law or agreement to divide the lands in severalty had any effect to create such a title until the lands were actually allotted. All these laws contemplated that the tribe, through its members, would receive substantially the whole reservation in lands or money. If the right to lands was vested after enrollment, and before allotment, then why was the interest of the Indians not actually vested in the remaining lands and money? Yet it was expressly held in *Gritts v. Fisher,* 224 U. S. 640 [32 Sup Ct. 580, 56 L. Ed. 928], that the interest in the remaining lands and money was not vested, and that new participants could be added by Congress. The enrolling primarily established the right of citizenship, and only incidentally conferred the right to

allotment, and, until allotment was made, no inheritable right vested in the individual Indian. * * *"

In the opinion it is further said:

"When the allotment was made, for the first time the rights of any individual vested, and the title became vested in the one at that time fixed by the law, and it makes no difference what previous laws may have provided."

If no such interest had vested that could be inherited until after the allotment, certainly no equitable title to the land in controversy vested until allotment. It was upon the theory that an equitable estate had vested before the issuance of patent that conveyances prior to the issuance of patent were sustained. *Goat et al. v. United States, supra; Godfrey v. Iowa Land & Trust Co., supra; McWilliams Inv. Co. v. Livingston et al., supra.* This holding confirms our construction of the provision from act April 21, 1904, above set out. If prior to allotment the members of the tribe had no such vested interest as could be inherited, obviously Congress did not remove the restrictions against alienation, so as to permit such member to alienate his land before it was allotted to him; for in the exercise of its guardianship over the Indians it was certainly the contemplation of the federal government that in the alienation of his land he should receive a consideration therefor commensurate with its reasonable value. If by removal of restrictions he were permitted to sell his prospective allotment when "it was a mere float—giving him the right to no specific property"—such a policy would not be conducive to bring about salutary results in favor of the member of the tribe, to the end that he should receive his equal share in the allotment of lands, and the same be alienated under conditions that would reasonably bring him a consideration commensurate to its reasonable value. *Gann v. Ball*, 26 Okla. 26, 110 Pac. 1067, is not in any event an authority against this conclusion, as the validity of the contract was not attempted to be raised, but treated by all parties to said litigation as valid. As to its validity no intimation is here made.

The title to the public domain or tribal lands of the Cherokee Nation was in the Cherokee Nation, and not in the individuals. *Godfrey v. Iowa Land & Trust Co., supra; Gritts v. Fisher,*

*supra; Cherokee Trust Fund,* 117 U. S. 288, 6 Sup. Ct. 718, 29 L. Ed. 880; *Cherokee Nation v. Journeycake,* 155 U. S. 196, 15 Sup. Ct. 55, 39 L. Ed. 120.

Article 20 of the Treaty with the Cherokees of July 19, 1866 (14 St. at L. p. 799), provides:

"Whenever the Cherokee national council shall request it, the Secretary of the Interior shall cause the country reserved for the Cherokees to be surveyed and allotted among them, at the expense of the United States."

Section 706, art. 23, p. 351, Laws of the Cherokee Nation, provides:

"It shall not be lawful for any citizen of the Cherokee Nation to sell any farm, or other improvement in said nation, to any person other than a *bona fide* citizen thereof; nor shall it be lawful to rent any farm or other improvements in this nation to any person other than a citizen of the Indian Territory; and every person who shall offend herein shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall suffer punishment by fine, in any sum not less than ten dollars, nor exceeding five hundred dollars, or in default of payment, by imprisonment for any term not exceeding one year."

Said section of the Cherokee Laws was superseded by the Cherokee Agreement or Act Cong. July 1, 1902 (32 St. at L. 716), and section 18 of said agreement, when considered in connection with sections 14 and 15 thereof under the rule of construction, *expressio unius exclusio alterius,* has the effect of confining members of the Cherokee Nation to the *possession* of land not exceeding that of 110 acres of average allottable lands of the Cherokee Nation, either for himself or for his wife or for each of his minor children that are members of said tribe. Following up this rule of construction, it would follow that said sections had the effect of prohibiting such members from selling any part of the public domain. From the treaties between Congress and the Cherokee Tribe and the legislation enacted by Congress affecting the Cherokee Nation, in the light of the tribal laws herein set out, it is obvious that it was the intention of Congress that members of said tribe should not convey any interest in the public domain and that such conveyance when made is void as against public policy.

Section 642, c. 27, Mansf. Dig. of Ark. (1884), provides:

"If any person shall convey any real estate by deed, purporting to convey the same in fee simple absolute, or any less estate, and shall not at the time of such conveyance have the legal estate in such lands, but shall afterward acquire the same, the legal or equitable estate afterward acquired shall immediately pass to the grantee, and such conveyance shall be as valid as if such legal or equitable estate had been in the grantor at the time of the conveyance."

Said section of the Statutes of Arkansas was extended in force in the Indian Territory on February 19, 1903. Act April 28, 1904, c. 1824, 33 St. at L. 573; 10 Fed. St. Ann. 138. Section 642 merely announces by statute the general rules of estoppel.

"Where a grantor conveys land with warranty in which he has nothing at the time, he is not only estopped from claiming in opposition to his deed, but the estate which subsequently vests in him is bound by the estoppel and is transferred by the operation of the estoppel to the grantee." (2 Herman on Estoppel and Res Judicata, sec. 658, p. 793.)

Said Fulsom not being an allottee at the time he executed the first deed, to wit, the one of January 27, 1908, section 642 does not apply to him as to said deed. Said section 642 was intended to apply to conveyances where the land covered by such conveyance was subject to be conveyed, but where the grantor had not the title vested in him according to his covenant. Said land prior to the time of its being selected by Fulsom as a part of his allotment being a part of the public domain of the Cherokee Nation, though he was a member of said tribe, he could not execute any lawful conveyance thereto, as such conveyance was void (1) on the ground that restrictions had not been removed as to such land, and (2) further because it was against public policy for him to execute a conveyance to a part of the public domain of said nation. The rule of estoppel as declared by said section 642 has no application to conveyances executed in the face of the law. Such conveyance being void when executed, said section 642 was not intended to breathe life into it.

The question of a constructive allotment or where the party had done everything reasonably within his power to select

his allotment by making application, etc., but being wrongfully refused, etc., is not in this case. As to such possible exceptions we express no opinion.

This holding does not affect the owner of the improvements upon town lots in the town sites of the Five Civilized Tribes. Act May 31, 1900, c. 598, 31 St. at L. 221; act July 1, 1902, c. 1361, sec. 45, 32 St. at L. 652. There the town-site commissioners were required to survey and lay out the town sites, and prepare correct plats thereof, one to be filed with the Secretary of the Interior, one with the clerk of the United States Court, one with the authorities of the tribes, and one with the town authorities. All town lots were to be appraised by said commission, and then the owner of the improvements was to deposit in the United States treasury at St. Louis, Mo., one-half of said appraised value as follows: Ten per cent. within two months; 15 per cent. within six months; and the remainder in three equal annual installments thereafter. The Supplemental Chickasaw and Choctaw Treaty (32 St. at L. 641) in certain instances provided for the payment of all the appraisement by the owner of the improvements, but did not change the manner. No provision of the town-site laws prevented the owner of the improvements on such lot, after the same was appraised and he had made the first payment, from conveying or contracting for sale of the lot or his equity therein, and under such event said section 642 would apply. *Goat et al. v. United States, supra.*

The question of the adverse holding of the defendant at the time of the execution of the deed to plaintiffs, not being raised, is not passed on. *Martin v. Cox et al.,* 31 Okla. 543, 122 Pac. 511; *Miller v. Fryer, ante,* 128 Pac. 713.

The judgment of the lower court is affirmed.

All the Justices concur.