## SIMPKINS *et al.* v. WARE.

No. 5453.   Opinion iled September 22, 1914.

Rehearing Denied January 9, 1915.

(145 Pac. 355.)

1. INDhANS—Tribal Property—Inheritable Interest. Prior to the taking effect of the act of Congress of June 28, 1906, (34 Stat. 539 c. 3572,) entitled "An act for the division of the lands and funds of the Osage Indians in Oklahoma territory, and for other purposes," a member of the Osage Tribe of Indians had no estate or interest in the lands and other property of the tribe to which her heirs would succeed at her death.

2. SAME—Heirship—Husband and Wife. Upon the death of an Osage Indian woman, who had been married more than once, and whose estate consists of lands and other property allotted and set aside to her, under the provisions of the act of Congress of June 28, 1906, during coverture with a surviving husband, such husband succeeds to one-third of said estate.

(Syllabus by the Court.)

*Error from District Court, Osage County;*

*R. H. Hudson, Judge.*

Proceedings instituted in county court between Mary L. Simpkins and others and David A. Ware, to have declared the

rights of all persons in the matter of the estate of Victoria Ware, deceased. From a judgment of the district court on appeal that David A. Ware was entitled to one-third interest in such estate, the other parties bring error. Affirmed.

*H. P. White* and *A. M. Widdows,* for plaintiffs in error.

*Leahy & McDonald,* for defendant in error.

*Preston A. Shinn, amicus curiae.*

BLEAKMORE, J. This case presents error from the district court of Osage county. The proceeding was commenced in the county court of that county under the provisions of section 6488, Rev. Laws 1910, for the purpose of having ascertained and declared the rights of all persons in the matter of the estate of Victoria Ware, deceased. Upon determination of the cause there, appeal was had to the district court, and from the judgment of that court adjudging that the defendant in error, David A. Ware, the surviving husband, was entitled to an undivided one-third interest in said estate, plaintiffs in error bring the case here. The facts, as disclosed by the record, are that the deceased, then Victoria Del Orier, a member of the Osage Tribe of Indians, and a widow with six children by former marriage and a grandchild by a deceased son, was married to David A. Ware on the 10th day of December, 1904, and lived with him, as his wife, until her death on the 30th day of March, 1911. Her husband, David A. Ware, defendant in error, and said children and grandchild, plaintiffs in error, survived her. Her entire estate consisted of Osage lands allotted to her, moneys segregated and placed to her credit, and her interest in the moneys due or that might thereafter become due to be held in trust for the Osage Tribe of Indians by the United States.

Dealings with the Osages are evidenced by numerous treaties made by the United States with them, beginning in 1808 and

culminating in the purchase from the Cherokee Nation of the lands now occupied by the members of the Osage Tribe and the division thereof under the terms of an act of Congress approved June 28, 1906, entitled "An act for the division of the lands and funds of the Osage Indians in Oklahoma Territory, and for other purposes." An examination of the various provisions of those treaties will be unprofitable.

By said act of June 28, 1906, it was provided:

"That the roll of the Osage Tribe of Indians, as shown by the records of the United States in the office of the United States Indian agent at the Osage Agency, Oklahoma territory, as it existed on the first day of January, nineteen hundred and six, and all children born between January first, nineteen hundred and six, and July first, nineteen hundred and seven, to persons whose names are on said roll on January first, nineteen hundred and six, and all children whose names are not now on said roll, but who were born to members of the tribe   *   *   *   who have, or have had, white husbands, is hereby declared to be the roll of said tribe and to constitute the legal membership thereof."

It was also provided:

"That all lands belonging to the Osage Tribe of Indians in Oklahoma territory, except as herein provided, shall be divided among the members of said tribe, giving to each his or her fair share thereof."

Every such enrolled member was permitted to select three tracts of 160 acres each, and it was provided further by said act that all oil, gas, coal, and other minerals covered by the land, for the selection of which provision was made, was reserved to the Osage Tribe for a period of 25 years from the 8th day of April, 1906, and that all royalties from mineral leases and all moneys received from the sale of town lots and from the leasing of grazing lands should be placed in the treasury of the United States to the credit of the members of the tribe and distributed to those appearing upon the tribal rolls. The evident purpose of this act

was, so far as practicable, to provide for a final disposition of the affairs of the tribe and a division of the property thereof to its members in severalty.

By section 6 of said act it is provided:

"That the lands, moneys, and mineral interests, herein provided for, of any deceased member of the Osage Tribe shall descend to his or her legal heirs, according to the laws of the territory of Oklahoma, or of the state in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys, and mineral interests must go to the mother and father equally."

Section 8418, Rev. Laws 1910, provides *inter alia* that:

"If the decedent leave a surviving husband or wife, and more than one child living, or one child living and the lawful issue of one or more deceased children, one-third to the surviving husband or wife, and the remainder in equal shares to his children, and to the lawful issue of any deceased child, by right of representation: * * * Provided, that if the decedent shall have been married more than once, the spouse at the time of death shall inherit of the property not acquired during coverture with such spouse only an equal part with each of the living children of decedent, and the lawful issue of any deceased child by right of representation. * * *"

It is contended by the plaintiffs in error that the estate of the deceased, Victoria Ware, as a member of the Osage Tribe of Indians, was acquired by reason of her Osage Indian blood, and was vested in her prior to her marriage with the defendant in error, while, on the other hand, it is urged by the defendant in error that all of said estate was acquired under and by virtue of the provisions of the allotment act of 1906, *supra,* and that prior to the passage of that act all of said estate was an undivided portion of the tribal property held by the United States in trust for the Osage Tribe of Indians and its members.

Various assignments of error are made, but the sole ques-

tion determinative of this case is: Was the deceased Victoria Ware, the owner of her Indian estate prior to her marriage to defendant in error, or did she acquire all the right and title thereto descendable and distributable under the laws of Oklahoma by virtue of the provisions of the allotment act of 1906?

As to the title and ownership of Osage lands and other property, it was said by Judge Cotteral in *United States v. Aaron,* (C. C.) 183 Fed. 347:

"The Osage lands, which constituted their reservation in Oklahoma, were acquired from the Cherokee Nation, pursuant to the treaty between that nation and the federal government of July 19, 1866, which stipulated for the settlement of friendly Indians in the Cherokee country west of 96° and the conveyance of the lands in fee simple 'to each of the tribes to be held in common or by their members as the United States may decide.' 14 Stat. 804. Payment was made to the Cherokees out of the proceeds of the lands of the Osages in Kansas. Act March 3, 1873, c. 228, 17 Stat. 538. On the ground that the Cherokee title was owned in fee simple, it is argued that the Osages acquired an equivalent title, and that, as title may be fully vested by treaty or law, they acquired 'an absolute and unqualified title to these lands' upon the selection of allotments under the act of Congress with the consent of the government. But such title as the Osages obtained was held in common, and was in no sense vested in the individual members of the tribe. Their lands were set apart and confirmed as their reservation by Act June 5, 1872, c. 310, 17 Stat. 228. As was held with respect to the Cherokee lands, the disposition thereof is an administrative subject, under the sole control of Congress. *Cherokee Nation v. Hitchcock,* 187 U. S. 295, 23 Sup. Ct. 115, 47 L. Ed. 183. The actual transfer of the Osage lands appears to have been made by deed of the Cherokee Nation to the United States in trust for the benefit of the Osage Indians. It was entirely competent for the government to determine upon and execute its own plan for the division of these lands among the members of the tribe. While it is doubtless true that the titles to the lands of Indians may be vested in tribes or their members by either law or treaty, such titles do not vest in the individual members without the sanction of the govern-

ment, and certainly not in a manner contrary to restriction declared by Congress."

In *Gritts v. Fisher*, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928, speaking with reference to the Creek Indians, the court said:

"During the last 20 years Congress has enacted a series of laws looking to the allotment and distribution of the lands and funds of the Five Civilized Tribes, of which the Cherokee Tribe is one, among their respective members, and to the dissolution of the tribal governments. * * * Anterior to this legislation the lands and funds belonged to the tribe as a community, and not to the members severally or as tenants in common. The right of each individual to participate in the enjoyment of such property depended upon tribal membership, and when that was terminated by death or otherwise the right was at an end. It was not alienable or descendible. And when children were born into the tribe they became thereby members and entitled to all the rights incident to that relation. Under treaties with the United States the tribe maintained a government of its own, with legislative and other powers, but this was a temporary expedient, and in time proved inefficient and unsatisfactory. As in the instance of other tribal Indians, the members of this tribe were wards of the United States, which was fully empowered, whenever it seemed wise to do so, to assume full control over them and their affairs, to determine who were such members, to allot and distribute the tribal lands and funds among them, and to terminate the tribal government."

In *McKee v. Henry*, 201 Fed. 74, 119 C. C. A. 412, the Circuit Court of Appeals for the Eighth Circuit, speaking of the power of Congress to provide for descent and distribution of Indian lands and property, said:

"But it (Congress) had full and ample authority to fix the laws of descent, with or without the consent of the Indians, both under its guardianship of the Indians and their property, and under its power to make all needful rules and regulations respecting the territory belonging to the United States. It had this right to make laws by agreement with the Indians, but it beclouds

the issue if it be assumed that such agreement was necessary when it was not. These lands belonged to the Indians as a tribe so long as the tribe existed and they occupied the land, with reversion to the United States; but no part of these lands belonged to any specific Indian. The Muskogee or Creek Tribe was in the nature of a dependent nation; and, as our national public buildings belong to the nation, the citizen, while he has an interest in them, has no share in the title to them, so these lands, so far as the Indian title was concerned, belonged to the tribe as a community, and no separate Indian had any title whatever, severally or as a tenant in common. No law or agreement to divide the lands in severalty had any effect to create such a title *until the lands were actually allotted*. All these laws contemplated that the tribe, through its members, would receive substantially the whole reservation in lands or money. If the right to lands was vested after enrollment and before allotment, then why was the interest of the Indians not actually vested in the remaining lands and money? Yet it was expressly held in *Gritts v. Fisher,* 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928, that the interest in the remaining lands and money was not vested, and that new participants could be added by Congress."

Thus it will be seen that the estate in question was acquired by and vested in the deceased, Victoria Ware, by virtue of the provisions of said act of 1906 and during the existence of the marriage relation between her and the defendant in error.

Prior to the taking effect of the allotment act of 1906, no law providing for or regulating the descent and distribution of the lands, moneys, or other interests of the Osages existed, and it is by virtue of the terms of this act alone that the parties to this proceeding succeeded to the estate in question or any part thereof.

It follows that the judgment of the trial court must be affirmed; and it is so ordered.

All the Justices concur.