## ALLEN v. OLIVER.

No. 898.   Opinion Filed June 22, 1911.

Rehearing Denied January 12, 1912.

(121 Pac. 226.)

**INDIANS—Cherokee Allotments—Alienation.** Under sections 14 and 15 of the Cherokee Agreement, approved July 1, 1902 (Act July 1, 1902, c. 1375, 32 St. 717), all lands allotted to members of the said tribe, except homesteads, were alienable in five years after issuance of patent, and not prior thereto.

(Syllabus by the Court.)

*Error from District Court, Rogers County;*
*John H. Pitchford, Judge.*

Action between James P. Allen and H. H. Oliver. From the judgment, Allen brings error. Affirmed.

*Knight, Ezzard & Holtzendorff, W. H. Kornegay,* and *S. T. Bledsoe (Veasey & Rowland,* of counsel), for plaintiff in error.

*John Q. Adams,* for defendant in error.

*George S. Ramsey, amicus curiae.*

DUNN, J.   This case, presenting error from the district court of Rogers county, Okla., was filed on the 9th day of January, 1909.

There is but one question presented, which is:   When, under the Cherokee Agreement, an act of Congress approved July 1, 1902 (32 Stat. 716, c. 1375), and voted upon and accepted by the Cherokee Tribe of Indians on the 7th day of August, 1902, may a member of said tribe of Indians lawfully alienate the surplus lands included within his allotment?   This requires a consideration of sections 14 and 15 of the said act, which read as follows:

"14.   Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act.

"15.   All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent."

It is said in the brief of counsel for plaintiff in error that if a conveyance made by a Cherokee allottee of Indian blood, subsequent to the expiration of five years from the ratification of the agreement, but before the expiration of five years from the issuance of patent, should be held valid, the judgment of the trial court must be reversed, and the contention of plaintiff in error sustained.   If, on the other hand, it shall be held that a conveyance made by an allottee, subsequent to the expiration of five years from the ratification of the agreement, but within five years from the issuance of patent, is void, then on this question the judgment of the trial court is correct.

At the outset it may be stated that Congress has, by the use of the language employed in the foregoing sections, left its actual meaning considerably obscured, and that either construction leaves ground for argument that the other view is correct.   Either of these sections, standing alone, provided restrictions are held to have been within the legislative purview, would be simplicity itself; but, taken together, each has a tendency to render the meaning of the other obscure and uncertain.   It is a fundamental

canon of construction that no word, sentence, or section of an act shall be rejected if, on any reasonable hypothesis, it can be given a field within which to operate. If this were not the rule, and we were permitted to entirely reject section 15, our difficulties would be entirely relieved; or if, when the apparent policy and purposes of the act are taken into consideration, it could be assumed that restrictions were intended, and we were relieved of considering section 14, the same result would follow. The sole duty of a court in construing legislation is to ascertain from the language used, when possible, the legislative intent; but where obscurity exists it is often essential, in order to ascertain the particular intent of the Legislature, to call to the aid of the court some degree of implication, or, as was said by Chief Justice Marshall, in the case of *Durosseau v. United States,* 6 Cranch, 307, 314, 3 L. Ed. 232, quoted approvingly in the case of *The Paquete Habana,* 175 U. S. 677, 20 Sup. Ct. 290, 44 L. Ed. 320:

"The spirit, as well as the letter, of a statute must be respected; and where the whole context of the law demonstrates a particular intent in the Legislature to effect a certain object, some degree of implication may be called in to aid that intent."

And, in order to interpret an uncertain or obscure statute aright, courts must view the subject of legislation from the position occupied by those who have written it, and ascertain the legislative intent from the general purposes of the act. This thought is expressed by Judge Nott, in the case of *Upton v. United States,* 19 Ct. Cl. 46, 49, as follows:

"In this country, where statute law is the hurried work of overbusy individuals, very little importance can be attached to accidents of phraseology. Every year of judicial experience renders plainer the fact that judges, to interpret aright, must put themselves in the position of the legislators who make the statute, and gather from its general purposes the meaning of its obscurer parts."

In the case of *People ex rel. Keeney v. City of Chicago,* 152 Ill. 546, 38 N. E. 744, from which this court quoted approvingly in the case of *Town of Eufaula v. Gibson et al.,* 22 Okla. 507, 518, 98 Pac. 565, 569, it is said:

"A thing within the intention is regarded as within the statute, though not within the letter; and a thing within the letter

is not within the statute, unless within the intention. *Perry County v. Jefferson County,* 94 Ill. 214; *People v. Hoffman,* 97 Ill. 234; *Anderson v. Chicago, Burlington & Quincy Railroad Co.,* 117 Ill. 26, 7 N. E. 129. The several provisions of the statute should be construed together in the light of the general objects and purposes of the enactment, and so as to give effect to the main intent, although particular provisions are thus construed not according to their literal reading. *Hill v. Harding,* 93 Ill. 77; *Wabash, St. Louis & Pacific Railway Co. v. Binkert,* 106 Ill. 298. The intention is to be gathered from the necessity or reason of the enactment, and the meaning of words enlarged or restricted according to the true intent. *Castner v. Walrod,* 83 Ill. 171, 25 Am. Rep. 369; *Cruss v. Aden,* 127 Ill. 231, 20 N. E. 73, 3 L. R. A. 327. That which is implied is as much a part of the statute as that which is expressed. Potter's Dwarris, 145; *United States v. Babbitt,* 1 Black, 55, 17 L. Ed. 94."

In this act, as in all of the others under which the lands of the tribes of the Indian Territory were allotted to them, provision is made against the power of immediate alienation on the part of the allottees. The reason for this was noted by this court in the case of *Hancock et al. v. Mutual Trust Co. et al.,* 24 Okla. 391, 103 Pac. 566, wherein it was said:

"Recognition of the general inability of the individual members to at once successfully cope in a business way with many of the people among and surrounding them was taken by providing that all of those who were living, and who under the treaty personally took their allotments, were held, by virtue of the terms of the act, to be restricted in their right of alienation, and to take the land subject to this restriction. This condition and the reason for it are well stated in the case of *Jackson v. Thompson et al.,* 38 Wash. 282, 80 Pac. 454, wherein the Supreme Court of that state, speaking through Mr. Justice Dunbar, said: 'The Indians are wards of the government. These arrangements and provisions are provisions in their interest and by their consent, as indicated in the solemn treaties executed. The government, from the necessities of the case, in consideration of the inexperience of the Indians, was compelled to insert these provisions in deeds which it issued to them to prevent them from becoming the prey of sharpers and speculators, who would, for an insufficient consideration, obtain their lands, the ultimate result being that the Indians would become pensioners upon the government; and the mutual interests of the Indians and the government demanded some such

regulations.' And the same policy was likewise recognized by the Circuit Court of Appeals of the Eighth Circuit, in the case of *Beck v. Flournoy Live Stock & Real Estate Company*, 65 Fed. 30, 34, 12 C. C. 497, 501, wherein Justice Thayer, who prepared the opinion for the court, said: 'These limitations upon the power of the Indians to sell or make contracts respecting land that might be set apart to them for their individual use and benefit were imposed to protect them from the greed and superior intelligence of the white man. Congress well knew that if these wards of the nation were placed in possession of real estate, and were given capacity to sell or lease the same, or to make contracts with white men with reference thereto, they would soon be deprived of their several holdings; and that, instead of adopting the customs and habits of civilized life and becoming self-supporting, they would speedily waste their substance, and very likely become paupers. The motive that actuated the lawmaker in depriving the Indians. of the power of alienation is so obvious, and the language of the statute in that behalf is so plain, as to leave no room for doubt that Congress intended to put it beyond the power of white men to secure any interest whatsoever in lands situated within Indian reservations that might be allotted to Indians. "

A correct interpretation of the purposes and meaning of section 15, taken in conjunction with the preceding section, can be secured only by giving recognition to the policy expressed in the quoted portions which we have given above. This policy could not be enforced and carried out if the allotments made under the act were to have been alienable in five years after the date of its ratification. None were made of that date, and many of them not until a much later date, and some, doubtless, were not made until after the expiration of the five years provided for in section 14. Under these circumstances it is clear that section 14 would fail in providing the necessary period of protection which Congress. has uniformly deemed necessary in parceling the lands among the members of these tribes; and there is absolutely no reason to conclude that a different policy was intended.

Attorney General Bonaparte, on being called on by the Secretary of the Interior for his construction of these sections of the act, recognizes and predicates, in a measure, his opinion upon this reasoning. He says (Opinions of Attorneys General, vol. 26, pp. 351, 354):

"As the purpose of the five-year restriction upon alienation presumably was to keep the allottee in possession of his allotment for that length of time, so that he might acquire a knowledge of its value and uses, and be better fitted to dispose of it, such purpose might be impaired and, perhaps, altogether defeated if the date from which the restrictive period was to commence were held to be that of the ratification of the act, as many members might not have received their allotments until long after the ratification of the act, and in some cases not until after the expiration of five years from that time."

It is true that in section 15 there is no language affirmatively fixing restrictions and making inalienable the lands of these allottees; but the subject-matter with which Congress was dealing and the matter then before it was that of vesting titles to land in the members of the tribe, and of fixing the time within which they could not part with it. And when Congress said that "all lands allotted to the members of said tribe except  *  *  * homesteads  *  *  *  shall be alienable in five years after issuance of patent," it said, under the doctrine of *"Expressio unius exclusio alterius"* (*Betts v. Com'rs of the Land Office*, 27 Okla. 64, 69, 110 Pac. 766, 768), that such lands would not be alienable prior to that time; the word "in," as used in the phrase "alienable in five years," being used as an equivalent to "at the expiration of." This meaning was given to the same word, as used in a substantially similar way, in the case of *Allentown School District v. Derr,* 115 Pa. 439, 9 Atl. 55. In that case, the school district in its bond promised to pay to bearer, "at its office in the city of Allentown, Pa., the sum of $500.00, in twenty-five years after date, with interest from the 2nd day of January, 1874." The claim was made in that case that the bond was payable at any time within the 25 years. The Supreme Court, in discussing the contention, said:

"If it were not for the word 'in,' before the words 'twenty-five years after date,' there would be nothing on which to hang even a doubt as to the meaning of the last-quoted expression. It is contended the word 'in' is used in the sense of 'within,' or 'at any time during,' etc. While it may be sometimes employed in that sense, we do not think it was so intended in the bonds under consideration; but, if there should be any uncertainty as to the

sense in which it was used, the doubt should be resolved in favor of the obligee. Whart. on Const. art. 670; *White v. Smith,* 33 Pa. 186 [75 Am. Dec. 589]; *Beeson v. Patterson,* 36 Pa. 24; *Klaer v. Ridgway,* 86 Pa. 529. But we do not think the meaning of the bonds, as to time of payment, is in any manner affected by the use of the word in question. 'Payable in one and two years' is not an uncommon form of expression in memoranda of agreements and other writings, and is always understood to mean at the expiration of one and two years, respectively."

And it is held in the case of *In re Hoffmann,* 14 Wkly. Notes Cas. (Pa.) 563, 565:

"It has always been the opinion of the profession that, while a mortgage, payable 'within a certain time,' may, at the option of the mortgagor, be paid off at any time beyond that, a debt, payable 'in' a certain time, cannot be extinguished, without the consent of the creditor, before the expiration of the time specified."

See, also, *Buffum v. Buffum,* 11 N. H. 451; *Tipton et al. v. Utley,* 59 Ill. 25; ·*Spartali et al v. Benecke et al.,* 10 Common Bench Rep. (E. C. L. R.) 212.

So, considering the whole context of the law and the general policy of Congress as manifested in similar laws, we deem it to have been the particular intent in this case to make the lands with which they were then dealing inalienable for the full period of five years in the hands of the allottees; and while its meaning was, perhaps, inartistically expressed, still section 15 carries with it a clear implication that it existed, and, so finding, the judgment of the trial court is affirmed.

All the Justices concur.