### TRUSKETT et al. v. CLOSSER.

(Circuit Court of Appeals, Eighth Circuit. August 5, 1912.)

No. 3,749.

1. INDIANS (§ 16*)—LANDS—TRANSFERS BY MINORS.

Act May 27, 1908, c. 199, 35 Stat. 312, authorizes the leasing of allotments of minor Indians of the Five Civilized Tribes by their guardians under order of the proper probate court of the state, but provides that the jurisdiction of such courts shall be subject to the provisions of the act. It also defines minors as including "all males under the age of twenty-one years." *Held*, that a district court of the state, acting under a state statute, cannot confer majority on an Indian allottee under the age of 21 years so as to qualify him to lease, or otherwise transfer his allotment.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. § 16.*]

2. INDIANS (§ 15*)—LANDS—RESTRICTIONS ON ALIENATION.

Act July 1, 1902, c. 1375, § 14, 32 Stat. 717, which provides that lands allotted to Cherokee Indians shall not be alienated "before the expiration of five years from the date of the ratification of this act," does not remove the restrictions on alienation at the end of five years from the ratification of the act, regardless of the date of allotments subsequently made, but such section must be construed in connection with those pre-

---

ceding and following, the latter of which expressly provides that surplus lands "shall be alienable in five years after issuance of patent."

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 44; Dec. Dig. § 15.*]

Appeal from the District Court of the United States for the Eastern District of Oklahoma.

Suit in equity by Fred D. Closser against A. A. Truskett and W. O. Truskett. Decree for complainant, and defendants appeal. Affirmed.

James A. Veasey (L. A. Rowland, on the brief), for appellants.

G. T. Stanford and Eugene Mackey (T. H. Stanford, on the brief), for appellee.

Before SANBORN and HOOK, Circuit Judges, and WILLARD, District Judge.

WILLARD, District Judge. Robert F. Goodman, a Cherokee Indian of one-eighth Indian blood, became 21 years of age on September 25, 1910. Nearly one year before that, and on October 12, 1909, the district court of Washington county, Okl., entered a judgment which purported to remove his disabilities as a minor, and eight days thereafter, on October 20, 1909, he leased to Overfield, the assignor of the appellants, A. A. and W. O. Truskett, who were the defendants below, the land in question, which was patented to him on March 31, 1909, as a portion of his allotment selection in the lands of the Cherokee Indian Nation, under Act July 1, 1902 (32 Stat. 716). On September 14, 1910, the general guardian of Goodman, under authority of the probate court, leased the same land to the appellee, Closser, who was the plaintiff below.

[1] As said by appellants in their brief, the exact question presented is this:

"Did the district court of Washington county, Okl., have jurisdiction to confer the rights of majority on Robert F. Goodman, a Cherokee Indian allottee of one-eighth degree Indian blood? If so, appellants' lease is valid, and their demurrer to appellee's bill should have been sustained. If not, the action of the court below was not error."

The question was presented in the court below by demurrer to the bill. On the overruling of this demurrer defendants declined to answer, and a decree was entered quieting plaintiff's title to his leasehold interest. The decision of the case requires a construction of Act May 27, 1908 (35 Stat. 312).

At the time of the passage of this act, the United States had full control of the land allotted to Goodman. In Heckman v. United States, 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820, decided by the Supreme Court on April 1, 1912, which case affirmed the judgment of this court in a case reported under the name of United States v. Allen, 179 Fed. 13, 103 C. C. A. 1, it was said:

"The placing of restrictions upon the right of alienation was an essential part of the plan of individual allotment; and limitations were imposed by each of the allotment agreements. The separate statutes were supplemented

by the general acts of 1906 and 1908, **already** mentioned. These restrictions evinced the continuance, to this extent at least, of the guardianship which the United States had exercised from the beginning. That the conferring of citizenship was in no wise inconsistent with the retention of control over the disposition of the allotted lands was expressly decided in the case of Tiger v. Western Investment Co. [221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738], in which the conclusions of the court were thus stated:

" 'Conceding that Marchie Tiger by the act conferring citizenship obtained a status which gave him certain civil and political rights, inhering in the privileges and immunities of such citizenship unnecessary to here discuss, he was still a ward of the nation so far as the alienation of these lands was concerned, and a member of the existing Creek Nation. * * * Upon the matters involved our conclusions are that Congress has had at all times, and now has. the right to pass legislation in the interest of the Indians as a dependent people; that there is nothing in citizenship "incompatible with this guardianship over the Indian's lands inherited from allottees as shown in this case; that in the present case, when the act of 1906 was passed, the Congress had not released its control over the alienation of lands of full-blood Indians of the Creek Nation; that it was within the power of Congress to continue to restrict alienation by requiring, as to full-blood Indians, the consent of the Secretary of the Interior to a proposed alienation of lands such as are involved in this case; that it rests with Congress to determine when its guardianship shall cease, and, while it still continues, it has the right to vary its restrictions upon alienation of Indian lands in the promotion of what it deems the best interest of the Indian.' "

## Section 1 of the Act of May 27, 1908, is as follows:

"Section 1. That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions. All lands, except homesteads, of said allottees enrolled as mixed-blood Indians having half or more than half and less than three-quarters Indian blood shall be free from all restrictions. All homesteads of said allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe The Secretary of the Interior shall not be prohibited by this act from continuing to remove restrictions as heretofore, and nothing herein shall be construed to impose restrictions removed from land by or under any law prior to the passage of this act. No restriction of alienation shall be construed to prevent the exercise of the right of eminent domain in condemning rights of way for public purposes over allotted lands, and for such purposes sections 13 to 23 inclusive, of an act entitled 'An act to grant the right of way through Oklahoma Territory and the Indian Territory to the Enid and Anadarko Railway Company, and for other purposes,' approved February twenty-eighth. 1902 (Thirty-second Statutes at Large, page forty-three), are hereby continued in force in the state of Oklahoma."

Goodman came within the class first named in this section, having less than one-half Indian blood, and it is claimed that his allotment was freed from all restrictions. If that section stood alone, this contention might be sustained, but it must be construed with

other sections contained in the same act. Among them is section 2, which is as follows:

"Sec. 2. That all lands other than homesteads allotted to members of the Five Civilized Tribes from which restrictions have not been removed may be leased by the allottee if an adult, or by guardian or curator under order of the proper probate court if a minor or incompetent, for a period not to exceed five years, without the privilege of renewal: Provided, that leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise: And provided further, that the jurisdiction of the probate courts of the state of Oklahoma over lands of minors and incompetents shall be subject to the foregoing provisions, and the term minor or minors, as used in this act, shall include all males under the age of twenty-one years and all females under the age of eighteen years."

When Congress included minors in section 1, it had the right in other sections of the law to declare who should be considered minors for the purposes of that section. This it did in the latter part of section 2 above quoted. It is said that the declaration there made being in a proviso is limited to the section in which it is found. Congress expressly declared that such was not its intention, for instead of saying, the term minor or minors as used in this section, it said, "the term minor or minors, as used in this act." The same definition of the word "minor" is found in section 4 of the act of July, 1902 (32 Stat. 716).

The exclusive right to determine when Goodman became of age was in Congress, so far as his allotment was concerned. It declared that he should not become of age until he was 21. A law of Oklahoma which declared that he should become of age at 20 would be in conflict with the act of Congress, and would be void. So, any act of the state which authorized any of its courts to determine that Goodman became of age when he was 20, or that at such age he had the rights of an adult, would be in contravention of the same law, and would also be void. The decree of the district court of Washington county emancipating Goodman was based upon the provisions of sections 73, 74, and 75 of Wilson's Revised Statutes of 1903, which were adopted as the law of the state of Oklahoma. These statutes could confer no jurisdiction upon that court to remove the disabilities of infancy under which Goodman labored at the time the decree was made so far as his allotment was concerned. That decree was therefore void, and being void, and Goodman being a minor when the lease was made to Overfield, the latter acquired nothing thereby. The construction of this act came before the Supreme Court of Oklahoma in the case of Jefferson v. Winkler, 26 Okl. 653, 110 Pac. 755. In that case an Indian girl married when she was under 18, and while under that age conveyed her allotment. It was held that under the general law of Oklahoma the marriage emancipated her, but that this general law could not have effect in her case, in view of the provisions of the said act of May 27, 1908, and that her conveyance was void.

Section 6 of the act, so far as here important, is as follows:

"Sec. 6. That the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise specifically provided by law, be subject to the jurisdiction of the probate courts of the state of Oklahoma."

The appellants claim that the phrase "except as otherwise specially provided by law" refers to and includes the laws of Oklahoma. It is apparent, however, that the law therein mentioned must be federal law, and not state law. It cannot for a moment be supposed that Congress would take the trouble to place under the jurisdiction of a particular court the affairs of Indian minors, and in the same section provide that the state might by its action entirely nullify that provision.

Appellants also refer to section 4 as strengthening their claims. That section reads as follows:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

It is not necessary to decide here what the effect of that section is, nor what the full effect of section 6 is. When it has been held that the state of Oklahoma cannot by its legislation reduce the age of majority from 21 to 20, enough has been decided to determine this case.

[2] The last contention of the appellants is that as to 50 acres of the 80 acres in question the lease to Overfield was valid, because that was the surplus allotment of Goodman, that as to it all restrictions had been removed prior to the passage of the act of May 27, 1908, and because that act in section 1 provides that nothing therein shall be construed to impose restrictions removed from land by or under any law prior to the passage of the act. The restrictions contained in the act of July 1, 1902, under which this land was allotted, are found in sections 13, 14, and 15, and are as follows:

Section 13:

"Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to forty acres of the average allottable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment."

Section 14:

"Lands allotted to citizens shall not in any manner whatever or at any time be encumbered, taken, or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act."

Section 15:

"All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent."

The appellants rely upon section 14. The five years from the date of the ratification of the act expired on August 7, 1907, but the

five years from the date of the patent to Goodman have not yet expired. This question also has been before the Supreme Court of Oklahoma in the case of Allen v. Oliver, 121 Pac. 226, 227. The court there said:

"This policy could not be enforced and carried out if the allotments made under the act were to have been alienable in five years after the date of its ratification. None were made of that date, and many of them not until a much later date, and some, doubtless, were not made until after the expiration of the five years provided for in section 14. Under these circumstances, it is clear that section 14 would fail in providing the necessary period of protection which Congress has uniformly deemed necessary in parceling the lands among the members of these tribes; and there is absolutely no reason to conclude that a different policy was intended."

In 26 Opinions of Attorneys General, on page 354, is found the following statement:

"(1) In regard to your first inquiry, I think the clear and specific statements in section 15 of the Act of July 1, 1902, that 'all lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent,' should be taken as making definite and certain the interpretation to be given the negative expression in the previous section that such lands should not, among other things, 'be alienated by the allottee or his heirs before the expiration of five years from the date of the ratification of this act.' As the purpose of the five-year restriction upon alienation presumably was to keep the allottee in possession of his allotment for that length of time so that he might acquire a knowledge of its value and uses and be better fitted to dispose of it, such purpose might be impaired and perhaps altogether defeated if the date from which the restrictive period was to commence were held to be that of the ratification of the act, as many members might not have received their allotments until long after the ratification of the act and in some cases not until after the expiration of five years from that date. It will be observed that by section 13 the time when homesteads were to become alienable was fixed at 'not exceeding twenty-one years from the date of the certificate of allotment,' upon the receipt of which certificate by section 21 of the act the allottee became entitled to be put in possession of his allotment."

The purpose of the government was to protect the Indian. If section 14 had said that the land should not be alienated for 5 years, and section 15 had said that it should not be alienated for 10 years, can there be any doubt as to the construction which would have been given to those sections by a court? For the better protection of the Indian, it would be necessary to say that the restriction was for ten years and not for five years. Section 13 declares that homesteads shall be inalienable for 21 years from the date of the certificate of allotment. Section 14 says that "lands," and this on its face includes homesteads, shall not be alienated before the expiration of five years. Could it be seriously argued that section 14 should prevail over section 13, so as to make a homestead alienable in five years?

The decree of the court below is affirmed, with costs.