RIDER *et al.* v. HELMS *et al.*

No. 6612.    Opinion Filed June 1, 1915.

Rehearing Denied July 6, 1915.

(150 Pac. 154.)

**TAXATION—Indian Lands—Surplus Allotments.** The surplus, unrestricted allotments of duly enrolled Cherokee citizens, less than full bloods, are subject to taxation by and under the treaties and laws of the United States and the laws of Oklahoma.

(Syllabus by Watts, C.)

*Error from District Court, Sequoyah County;*
*John H. Pitchford, Judge.*

Action by Jack Rider and others against Lee Helms and others. Judgment for defendants, and plaintiffs bring error.    Affirmed.

*T. F. Shackleford,* for plaintiffs in error.

*Joe Bailey Allen, J. H. Miley,* and *Curtis & Pitchford,* for defendants in error.

Opinion by WATTS, C.    This action was begun in the district court of Sequoyah county, January 23, 1914, by Jack Rider for himself, and as next friend of his minor children and others.    There are some 400 named as plaintiffs.    The defendants are the county officers of Sequoyah county, viz., Lee Helms, treasurer, J. C. Woll, assessor, J. V. Blackard, clerk, and John E. Johnson, sheriff, who will be designated as they first appeared.    Plaintiffs are residents of Sequoyah county, members of the Cherokee Tribe of Indians, less than full bloods, allottees, patentees, and owners of certain tracts of land in the county.    The surplus and homesteads of each of the plaintiffs are particularly described.    They pray for an injunction against

defendants, their successors in office, enjoining the assess-
ing, levying, demanding, and collection of any taxes upon
their lands, and for judgment setting aside and holding
for naught all taxes assessed and levied against their
lands for the years of 1908 to 1913, inclusive.   Under
notice to defendants the petition was heard January 23,
1914, and the prayer of the petition was granted as to the
lands described as homesteads and denied as to the sur-
plus, from which plaintiffs appeal and assign as error the
following:

"(1) In not rendering judgment in favor of plain-
tiffs in error upon the pleadings in said cause; there being
no motion, demurrer, answer, or response filed by de-
fendants.

"(2) In finding, holding, and ordering the unrestrict-
ed lands of plaintiffs in error subject to taxation for state,
county, township, school, road and all other purposes pro-
vided by the laws of Oklahoma.

"(3) In denying plaintiffs' application and petition
for restraining order, enjoining the defendants from as-
sessing, listing, equalizing, and extending, on the tax rolls
of Sequoyah county, plaintiffs' allotted lands for the pur-
pose of taxation under the laws of Oklahoma.

"(4) In dismissing plaintiffs' said cause of action and
rendering judgment against plaintiffs and in favor of the
defendants for costs.

"(5) In holding that the Congress of the United
States had power and authority to pass legislation (Act
May 27, 1908), relating to the lands selected, allotted, and
patented to plaintiffs as members of the Cherokee Tribe
of Indians, and now citizens of the state of Oklahoma, and
thereby subject said lands to taxation for all purposes pro-
vided by the laws of the state of Oklahoma—said act of
Congress being contrary to and in conflict with the Con-
stitution and laws of the United States and the Constitu-
tion and laws of the state of Oklahoma, which are fully

set forth and pleaded in plaintiffs' application and petition filed in said trial court."

As the first proposition is not briefed, we take it counsel waives the question. The second and third assignments will be considered together as embracing a single proposition: Are the surplus, unrestricted allotments of duly enrolled Cherokee citizens, less than full bloods, subject to taxation by and under the treaties and laws of the United States and the state of Oklahoma? The treaty-making between the United States and the Cherokees began in 1785, more than 125 years ago, when the tribe was great and powerful in number, and, while they acknowledged themselves under the protection of the general government and agreed that the hatchet should be buried forever, retained many independent rights. The next treaty at Philadelphia, in 1791, included the recognition of the United States as the protector of the Indians, and while declaring peace and friendship would be perpetual, further inroads and concessions were agreed upon. In 1791 further concessions were granted and the annuities increased. Another treaty followed in 1794, ceding lands and changing the annuity from money to merchandise and increasing the amount. In 1798, a misunderstanding having arisen, another agreement was had, whereby much land was ceded to the United States and an agent of the government was placed among the tribe. Like treaties followed in 1804, 1805, 1806, 1816, 1817, and 1819. In 1828, the encroachment of the white man upon the lands of the Cherokees being so great, by treaty, many removed from their homes to what became known as the Cherokee Nation in the Indian Territory, where they were, "under most solemn guaranty of the United States, assured a permanent home, to be and remain theirs for-

ever." In 1833, at Ft. Gibson, another treaty, modifying and making certain the boundaries, establishing a permanent agent of the government among them and certain industrial agents for the purpose of teaching the red man the wisdom of a white man's pursuit, was agreed upon. In 1835, a great number of the tribe in Georgia and other states not having joined their brothers in their new location, another agreement was had, whereby such as would were to move to the promised land of peace and plenty, where they were to be defended in their possessions and property. In 1838, the land embraced in the territorial limits of the Cherokee Nation was patented to the Cherokee Nation. In 1866 amnesty was given those for whatever wrongs done during the war between the states, and the Cherokees also conceded the United States the right to establish courts, right of way for railroads, rights to establish military posts, etc. While the Cherokees had a Constitution and form of government, since 1839, similar to our own state governments, from 1866 they made most wonderful strides, notwithstanding the many changes and difficulties which they underwent, but, as said by Mr. Justice Lamar in *Choate v. Trapp*, 224 U. S. 667, 32 Sup. Ct. 566, 56 L. Ed. page 941:

"The Five Civilized Tribes owned immense tracts of land in territory that is now embraced within the limits of the state of Oklahoma. The legal title was in the Tribes for the common use of their members. But the fact that so extensive an area was held under a system that did not recognize private property in land presented a serious obstacle to the creation of the state which Congress desired to organize for the government and development of that part of the country. And, with a view of removing these difficulties, it provided (Act Mrach 3, 1893, c. 209, 27 Stat. 612, 645) for the appointment of the Dawes Commission, authorizing it to enter into negotia-

tions with these Tribes for the extinguishment of their title, either by cession to the United States or by allotment, in severalty, among their members. As might have been anticipated, the Commission found that many of the Indians were greatly opposed to any change. 'Some of them held passionately to their institutions from custom and patriotism, and others held with equal tenacity because of the advantages and privileges they enjoyed.' After several years of negotiations their opposition was so far overcome that provisional agreements were made which contemplated most radical changes in the political and property rights of the Indians."

The Dawes Commission, after treating with the Cherokees for several years, and with much opposition, were unable to make a satisfactory agreement. Congress, on June 28, 1898, passed what is known as the Curtis Act (30 Stat. 495, c. 517), which provided for an arbitrary allotment of their lands and other disposition of their property with the ultimate intention of their domain being embraced within a state. In 1899, representatives of the United States and Cherokee Nation made an agreement which was ratified by the Cherokees with a provision that, unless agreed to by Congress within a definite time, same should not be binding on the tribe. Either for want of sufficient time or intentionally, Congress did not take action thereon. In 1901, another agreement was made, but the Cherokees failed to ratify same. Thereafter Congress enacted what is now termed the "Cherokee Agreement," which was approved by the president July 1, 1902 (32 Stat. 716, c. 1375), and ratified by vote of the Cherokees July 7, 1902; and, while it is termed a treaty, it nevertheless was arbitrary legislation, with which the Cherokees had no part in its original construction. The great length of time consumed in attempting to agree with the Cherokees and the final failure to reach a satis-

factory agreement was perhaps one reason why the Cherokees were unable to get more favorable concessions, for instance, like the Choctaws and Chickasaws. Section 13 of the treaty just mentioned provides:

"Sec. 13. Each member of said tribe shall, at the time of the selection of his allotment, designate as a homestead out of said allotment land equal in value to forty acres of the average allotable lands of the Cherokee Nation, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment. Separate certificates shall· issue for said homestead. During the time said· homestead is held by the allottee the same shall be nontaxable and shall not be liable for any debt contracted by the owner thereof while so held by him."

The intention of this section is plain that during the time the homestead is held by the allottee, whether for one year or life, same shall be nontaxable. This is upon the theory that, each allottee having had a common interest ·in the lands and entitled to use and to occupy same, and the desire of Congress to extinguish the equitable interest of the individual and give each one in fee simple his proportionate part thereof, and in part consideration of the individual giving up his common interest in the whole and accepting certain and definite acreage, he was given a valuable and binding grant, which became a property right, and binding upon the state. The Supreme Court of this state has decided this proposition. See *Whitmire et al. v. Trapp*, 33 Okla. 429, 126 Pac. 578; *Wellep, Co. Treas., et al. v. Audrian*, 36 Okla. 288, 128 Pac. 254, and authorities cited. *Choate v. Trapp, supra,* involves land in what was the Choctaw Nation, but is decisive of the principle. Other sections of the Cherokee Treaty provide:

"Sec. 14. Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken or sold to secure or satisfy any debt or obligation, or be alienated by the allottee or his heirs, before the expiration of five years from the date of the ratification of this act.

"Sec. 15. All lands allotted to the members of said tribe, except such land as is set aside to each for a homestead as herein provided, shall be alienable in five years after issuance of patent."

Counsel for plaintiffs contends that the language, "Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken or sold to secure or satisfy any debt or obligation," is a valuable grant to his clients, which has not nor can be taken away by the United States or the state of Oklahoma. A great many authorities are cited in support of his contention, viz.: *Whitmire v. Trapp*, 33 Okla. 429, 126 Pac. 578; *Choate et al. v. Trapp et al.*, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941; *Gleason et al. v. Wood*, 224 U. S. 679, 32 Sup. Ct. 571, 56 L. Ed. 947; *English v. Richardson*, 224 U. S. 680, 32 Sup. Ct. 571, 56 L. Ed. 949; *New Jersey v. Wilson*, 7 Cranch, 164, 3 L. Ed. 303; *The Kansas Indians*, 5 Wall. 737, 18 L. Ed. 667; *The New York Indians*, 5 Wall. 761, 18 L. Ed. 708.

Our attention has been invited to the Enabling Act and the Constitution of the state, which provide:

"Section 1. Authority of United States Over Persons or Property of Indians and their Rights Unimpaired. —Provided, That nothing contained in the said Constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said territories, (so long as such rights shall reamin unextinguished) or to limit or affect the authority of the government of the United States to make any law or regulation

respecting such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this act had never been passed." (Williams' Annotated Constitution & Enabling Act of Oklahoma, p. 241.).

"Sec. 45. Acceptance of the Terms of Enabling Act. —Be it ordained by the constitutional convention for the proposed state of Oklahoma, that said constitutional convention do, by this ordinance irrevocable, accept the terms and conditions of an act of  *  *  *  Congress, of the United States, entitled 'An Act to enable the people of Oklahoma and the Indian Territory to form a Constitution and state government and be admitted into the Union on an equal footing with the original states.  *  *  *'" (*Id.* p. 238.)

### "ARTICLE 1.

"Sec. 3. Disclaimer of Jurisdiction as to Lands—Taxation.—The people inhabiting the state do agree and declare that they forever disclaim all right and title in  *  *  *  and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States.  *  *  *" (*Id.* p. 4.)

### "ARTICLE 25.

"Sec. 1. Rights and Procedure Preserved.—No existing rights, actions, suits, proceedings, contracts, or claims shall be affected by the change in the forms of government, but all shall continue as if no change in the forms of government had taken place.  *  *  *" (*Id.* p. 222.)

But the application of these provisions depends on the construction of sections 14 and 15 of the treaty, *supra.* If we should hold that by the terms of said sections an exemption against taxation was given, then the provisions quoted will be helpful to plaintiffs.

In *Whitmire v. Trapp, supra,* it is not certain whether the homestead, surplus lands, or both, were involved. From the syllabus we take it that it was the homestead; if not, same was definitely overruled in *Kidd v. Roberts,* 43 Okla. 603, 145 Pac. 862.

*Choate et al. v. Trapp et al., Gleason et al. v. Wood,* and *English v. Richardson, supra,* are not decisive. The first two cases involve the homestead and surplus allotments of Choctaw citizens. The allottees were the plaintiffs, and were seeking to restrain the officers from assessing and collecting taxes against their lands. The Choctaw and Chickasaw Agreement provided that:

"All the lands allotted shall be nontaxable while the title remains in the original allottee  *  *  *  but not to exceed twenty-one years from the date of the patent and that the patent should be formed accordingly."

*English v. Richardson* involved a Creek homestead, and the agreement provides:

"It shall be and remain nontaxable  *  *  *  and free from incumbrances whatever for twenty-one years from the date of the deed therefor."

—which condition should appear in the deed. The same nontaxable feature appears in the Cherokee Treaty (section 13) only so far as the homestead is concerned, but counsel for plaintiffs contends that section 14, Cherokee Treaty, *supra,* is of equal dignity if not paramount to the nontaxable provision quoted, but to his views we cannot subscribe. If section 14 ever had any connection to the taxation feature after the lapse of five years from the ratification of the act August 17, 1902, it became *functus officio* and not applicable, as the taxes sought to be enjoined do not come within the prescription. Counsel, however, contends that the five-years limitation is not a

qualification of, and has no appliaction to, the first part of section 14; that it should be read as modifying the period within which the allottee or his heirs may alienate the land, thereby causing the section to read as applicable here:

"Lands allotted to citizens shall not in any manner whatsoever or at any time be incumbered, taken or sold to secure or satisfy any debt or obligation"

—and read in this light it became a property right which Congress had a right to grant, was vested in the allottee and binding on the state; that the alienation clause was a personal privilege which did not abrogate his statutory grant of exemption from forced sale. Counsel made a very forceful oral argument in support of this proposition and has diagramed section 14 in order to show us the grammatical and logical relation of the words used. But we are not always governed by the grammatical construction. In the language of Justice Taney:

"In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law, and its object and policy." (*United States v. Boisdore,* 8 How. 122, 12 L. Ed. 1009.)

As was held in *Kansas City Bridge Co. v. Lindsay Bridge Co.,* 32 Okla. 31, 121 Pac. 636:

"The intention of the parties must be deducted from the entire agreement, and not from any part of parts of it, because, where a contract has several stipulations, it is plain that the parties agreed that their intention was not expressed by any single part or stipulation of it, but by every part and provision in it, considered together, and so construed as to be consistent with every other part."

See, also, *Fox v. Tyler,* 109 Fed. 258, 48 C. C. A. 356; *American Soda Fountain Co. v. Gerrer's Bakery,* 14

Okla. 258, 78 Pac. 115, 2 Ann. Cas. 318; *Rider v. Morgan,* 31 Okla. 98, 119 Pac. 958; *Minnetonka Oil Co. v. Cleveland Vitrified Brick Co.,* 27 Okla. 180, 111 Pac. 326.

The *Kansas Indians, supra,* involves the authority of the state of Kansas to tax Indian lands. Three tribes, the Shawnee, 'Wea, and Miami, were involved. Like the Cherokees, Congress had, for many years, made treaties with these Indians, and finally located them in what afterwards became a part of the state of Kansas. They held their lands in severalty, but maintained their tribal relations, such as having a chief, council, for the transaction of their affairs, the right to try members of their tribe, when the offense was against another member, separate schools and school funds, custom marriages—in fact, they maintained most all of their former usages and customs. The government kept an agent among them, paid annuities through their chiefs and head men, who represented the Indians in their dealings with the United States government. The same freedom from and inhibition against taxes were guaranteed as in the other cases discussed. They were held by the government as dependent wards. The Shawnees could not sell their land without the consent of the Secretary of the Interior. The Wea Tribe was similar in outline to the Shawnees. The Miami Tribe was, in its main aspect, like the other two. Restrictions were against the alienation of their lands except on approval of the Secretary of the Interior. There was a condition in the patents given the Miamis similar to that part of section 14 of the Cherokee Treaty above quoted, as follows:

"That the lands now patented shall not be liable to levy, sale or execution or forfeiture."

But in virtue of the specific exemption feature from taxation, none of these cases can be considered as authoritative.

The New Jersey case, *supra,* does not persuade us, for it provides:

"That the lands   *   *   *   shall not hereafter be subject to any tax."

A very similar provision to the New Jersey exemption appears in the *New York Indians Case, supra,* and we reject it for the same reason.

If we were in doubt, we think the most satisfactory test is, as said by Mr. Justice Davis in the *Kansas Indians, supra:*

"As long as the United States recognizes their national character, they are under the protection of treaties and the laws of Congress, and their property is withdrawn from the operation of state laws."

In *Goudy v. Meath,* 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130, Mr. Justice Brewer had a very similar condition of affairs to the case at bar. We think it decisive of the issues herein, and quote:

"In the brief filed by the plaintiff in error no question is made of his right to sell and convey the land. The Supreme Court of the state, in its opinion, says: 'It is conceded that the Indians may now sell their lands voluntarily and convey a title in fee, and that thereupon the lands so sold are subject to taxation in the hands of parties not Indians.' But the contention is that, although he has the power of voluntary sale and conveyance, yet until he has exercised that power the land is not subject to taxation or forced sale. His argument rests mainly upon the contention that there is no express repeal of the exemption, provided in the original treaty, 'from levy, sale or forfeiture.' That Congress may grant the power of

voluntary sale, while withholding the land from taxation or forced alienation, may be conceded. For illustration, see treaty of January 31, 1855, with the Wyandottes, 10 Stat. 1159, 1161. But while Congress may make such provision, its intent to do so should be clearly manifested; for the purpose of the restriction upon voluntary aliena- tions is protection of the Indian from the cunning and rapacity of his white neighbors, and it would seem strange to withdraw this protection and permit the Indian to dis- pose of his lands as he pleases, while at the same time releasing it from taxation. In other words, that the offi- cers of a state enforcing its laws cannot be trusted to do justice, although each/ and every individual acting for himself may be so trusted.

"But, further, by the act of February 8, 1887 [24 Stat. 388, c. 119], plaintiff became and is a citizen of the United States. That act, in addition to the grant of citi- zenship, provided that: 'Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside.' *Matter of Heff*, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848.

"Among the laws to which the plaintiff as a citizen became subject were those in respect to taxation. His property, unless exempt, became subject to taxation in the same manner as property belonging to other citizens, and the rule of exemptions for him must be the same as for other citizens; that is, that no exemption exists by impli- cation, but must be clearly manifested. No exemption is clearly shown by the legislation in respect to these Indian lands. The original treaty provided that they should be exempt from levy, sale, or forfeiture until the Legislature of the state should, with the consent of Congress, remove the restrictions. This, of course, meant involuntary as well as voluntary alienation. When the state was admit- ted and its Constitution formed, its Legislature granted the power of alienation 'in like manner and with like effect as any other person may do under the laws of the United States and of this state, and all restrictions in reference

thereto are hereby removed.' What restrictions? Evidently those upon alienation. The Indian may not only voluntarily convey his land (authority to do that is provided by the use of the word 'grant,'), but he may also permit its alienation by any action or omission which in due course of law results in forced sale. Congress postponed the operation of this statute for ten years. When the ten years expired (and they had expired before this tax was attempted to be levied) all restriction upon alienation ceased. It requires a technical and narrow construction to hold that involuntary alienation continues to be forbidden while the power of voluntary alienation is granted; and it is disregarding the act of Congress to hold that the Indian, having property, is not subject to taxation when he is subject to all the laws, civil and criminal, of the state."

Counsel for plaintiffs further urges that, as "five years after the issuance of the patent" (as provided in section 15 of the treaty) has been held to be the true date from which restrictions were removed (*Allen v. Oliver*, 31 Okla. 356, 121 Pac. 226; *Truskett et al. v. Closser*, 198 Fed. 835, 117 C. C. A. 477) instead of five years from date of the ratification of the act (section 14, treaty), and as many of the patents in the instant case did not issue until as late as 1912, it necessarily follows that the restrictions were upon each individual allottee, and during such restricted period the lands could not be sold to satisfy such tax claim; but, as we view it, this position is untenable for the reason, as we said in *Choate v. Trapp*:

"Exemption and nonalienability are two separate and distinct subjects; one conferred a right, and the other imposed a limitation."

The period of exemption was not necessarily coincident with the five-year limitation; that is, section 14 granted a right to the allottee that for five years from

date of the ratification of the agreement, his land should not be taken, or sold, etc. This, we think, was a valuable grant such as mentioned in the *Choate-Trapp Case,* but it expired within its own limitation; and, while we think it true that allottees were afforded protection amounting to same, as mentioned in section 14, until the expiration of the five-year limit mentioned in section 15, by reason of its inalienability such protection, however, is only incident thereto, and in this sense not a grant amounting to a vested right, and, in this connection, as was said by Mr. Justice Lamar, in *Choate v. Trapp:*

"The right to remove the restriction was in pursuance of the power under which Congress could legislate as to the status of the ward and lengthen or shorten the period of disability," or wholly remove same.

Act May 27, 1908, c. 199 (35 Stat. L. 312, 313), sec. 1, provides:

"That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions. All lands, except homesteads, of said allottees enrolled as mixed-blood Indians having half or more than half and less than three-quarters Indian blood shall be free from all restrictions. All homesteads of said allottees enrolled as mixed-blood Indians having half or more than half Indian blood, including minors of such degrees of blood, and all allotted lands of enrolled full-bloods, and enrolled mixed-bloods of three-quarters or more Indian blood, including minors of such degrees of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrance prior to April twenty-sixth, nineteen hundred and

thirty-one, except that the Secretary of the Interior may remove such restrictions, wholly or in part, under such rules and regulations concerning terms of sale and disposal of the proceeds for the benefit of the respective Indians as he may prescribe. The Secretary of the Interior shall not be prohibited by this act from continuing to remove restrictions as heretofore, and nothing herein shall be construed to impose restrictions removed from land by or under any law prior to the passage of this act.  *  *  *

"Sec. 4. That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of [some] other persons than allottees of the Five Civilized Tribes: Provided, that allotted lands shall not be subjected or held liable, to any form of personal claim, or demand, against the allottees arising or existing prior to the removal of restrictions, other than contracts heretofore expressly permitted by law."

Therefore the five-years limitation, being a period of nonalienability and not an exemption, when Congress removed the nonalienable feature it did not interfere with any existing property right, as held in the *Choate v. Trapp* and other cases herein referred to.

At the time the treaty of July 1, 1902, was entered into, Congress, no doubt, had fully resolved to end the tribal relations of the Five Civilized Tribes, and, as soon as practicable and at the most convenient date, pass such legislation as would enable the people inhabiting the Indian country to form a state government. Not only the Cherokees, but other citizens of the Five Civilized Tribes, had progressed rapidly; many had massed fortunes of considerable magnitude; their educational institutions were equal to those in the states; they had intermarried with other nationalities until the degree of Indian blood of 75 per cent. of their citizens could not be ascertained. Their men and

women were among the leaders in all communities, and of these facts it cannot be said Congress was ignorant. As further evidence of their advancement, it is appropriate to say, at this time one of our United States Senators and two members of Congress, Commissioner to the Five Civilized Tribes, the Register of the United States Treasury, two members of the State Board of Agriculture, ex-Speaker of the House of Representatives, and many minor state officers are Indians. In fact the Indians are among the leading citizens in both public and private life in what was formerly the Indian Territory. We mention this to illustrate the difference in the Indian of 50 and 100 years ago, whom it was necessary to protect, and the Indian of the Five Civilized Tribes, who, as a rule, is intelligent, thrifty and as able to care for himself as any other class of citizens. They are citizens of the United States and have the protection of the laws, benefit of the schools, hold offices—in fact, are afforded the same rights and privileges as other citizens of the state. And should they not be required to pay their proportionate part of the revenues? Unless the law plainly exempts them we cannot give assent to this unusual exemption. We do not think the language of the treaty leaves the question in doubt, and, if so, it is fair to call to our assistance the condition of the high contracting parties, the necessity of the protection claimed, the aim and intent of the treaty, the immediate construction placed thereon by one or both parties, prior and subsequent legislation—in fact, any legitimate reflection which may give light upon the subject. In this connection we quote a portion of section 19, Act Cong. April 26, 1906, c. 1876 (34 Stat. 137):

· "That all lands upon which restrictions are removed shall be subject to taxation."

The act May 27, 1908, is certainly conclusive that Congress after the lapse of five years, mentioned in section 14 of the treaty, intended that unrestricted lands, not specifically shielded from the state laws, such as homesteads, should be subject to taxation. Had it been ·the intention to exempt this class of surplus lands, more appropriate language would have been employed; for instance, such as is used in section 13 of the treaty.

We are not unmindful that in construction of Indian legislation, where a question is in doubt, it should be resolved in behalf .of the Indian, but under the facts and circumstances surrounding the instant case the rule has no application here. True, Congress has always justly had plenary power over tribal relations of Indians, which has been deemed a political one, and not to be controlled by the court, but it is just as true that Congress has the sole power of saying when its guardianship shall cease; and when Congress said, "For five years your surplus lands will be protected," it was tantamount to saying that thereafter, and so far as the United States is concerned, it may be taken or sold to secure or satisfy any ·debt or obligation, or be alienated, etc., which, of course, includes authority to assess and collect taxes. In *Kidd v. Roberts*, 43 Okla. 603, 143 Pac. 862, Judge Bleakmore reached the same conclusion at which we have arrived. ·

The plaintiff has assigned other alleged errors, but, having reached the foregoing conclusion, it will not be necessary to discuss them. Finding no error, we recommend that the judgment of the trial court be confirmed.

By the Court: It is so ordered: